LOREN E. PARKS, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT
PARKS FOUNDATION, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7043–07, 7093–07.     Filed November 17, 2015.

PF is a corporation exempt from income tax under I.R.C. sec. 501(c)(3) and classified as a private foundation under I.R.C. sec. 509(a). P is a foundation manager of PF as defined in I.R.C. sec. 4946(b). During its taxable years ended Nov. 30, 1997 through 2000, PF made cumulative expenditures of $639,073 to produce and broadcast 30- and 60-second radio messages. As a foundation manager, P agreed to the making of the expenditures. R determined that the foregoing expenditures were "attempts to influence legislation and/or the opinion of the general public" and therefore taxable expenditures, rendering PF and P liable for excise taxes under I.R.C. sec. 4945(a)(1) and (2), respectively. R further determined that because the taxable expenditures were not timely corrected, PF and P were also liable for excise taxes under I.R.C. sec. 4945(b)(1) and (2), respectively. *Held*: Pursuant to the regula-

278

tions interpreting I.R.C. sec. 4945(e), a communication refers to a ballot measure if it either refers to the measure by name or, without naming it, employs terms widely used in connection with the measure or describes the content or effect of the measure. *Held*, *further*, PF's expenditures for the radio messages were taxable expenditures under I.R.C. sec. 4945(d)(1) or (5) to the extent redetermined herein; consequently PF is liable for excise taxes under I.R.C. sec. 4945(a)(1) to the extent redetermined herein. *Held*, *further*, P is liable for excise taxes under I.R.C. sec. 4945(a)(2) to the extent redetermined herein. *Held*, *further*, PF and P are liable for excise taxes under I.R.C. sec. 4945(b)(1) and (2), respectively, to the extent redetermined herein. *Held*, *further*, the application of I.R.C. sec. 4945 and the regulations thereunder to PF and P does not violate the First Amendment to the U.S. Constitution, and the regulations are not unconstitutionally vague.

*Kevin O'Connell*, *Steven B. Hval*, and *Tara Lawrence*, for petitioners.

*Mark Alan Weiner*, for respondent.

OPINION

GALE, *Judge*: These cases were consolidated for trial, briefing, and opinion. Respondent determined excise tax deficiencies for petitioner Loren E. Parks and petitioner Parks Foundation (Foundation) as summarized in the following tables. [1]

Mr. Parks, Docket No. 7043–07

| | *Excise tax* | |
| Year | Sec. 4945(a)(2) | Sec. 4945(b)(2) |
| 1997 | $1,625 | $10,000 |
| 1998 | 5,000 | 10,000 |
| 1999 | 825 | 10,000 |
| 2000 | 5,000 | 10,000 |

[1] All section references are to the Internal Revenue Code of 1986 as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

Foundation, Docket No. 7093–07

| TYE 11/30 | Sec. 4940(a) | Sec. 4945(a)(1) | Sec. 4945(b)(1) |
|---|---|---|---|
| | | *Excise tax* | |
| 1997 | --- | $6,500 | $65,000 |
| 1998 | $1,979 | 20,000 | 200,000 |
| 1999 | --- | 3,301 | 33,012 |
| 2000 | --- | 34,106 | 341,062 |

The issues for decision[2] are: (1) whether expenditures by Foundation during its years at issue for the production and broadcast of 30- and 60-second radio messages were taxable expenditures within the meaning of section 4945(d), making Foundation liable for excise taxes imposed by section 4945(a)(1); and, if so, (2) whether Foundation is liable for additional excise taxes imposed by section 4945(b)(1) for failing to timely correct the expenditures; (3) whether Mr. Parks is liable for excise taxes imposed by section 4945(a)(2) because he knowingly agreed to the making of the expenditures; (4) whether Mr. Parks is liable for additional excise taxes imposed by section 4945(b)(2) for refusing to agree to correction of the expenditures; and (5) whether section 4945 and the regulations thereunder as applied to petitioners violate the First Amendment to the Constitution.

## *Background*

These cases were submitted for decision without trial under Rule 122. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. At the time the petitions were filed Mr. Parks resided in Nevada and Foundation had its principal place of business in Nevada.

### *Foundation's Status, Organization, Support, and Expenditures*

Foundation's predecessor was incorporated in Oregon in 1977.[3] In 1979 the Internal Revenue Service (IRS) recog-

---

[2] The parties stipulated that the $1,979 excise tax deficiency determined under sec. 4940 for Foundation's taxable year ended November 30, 1998, is a computational adjustment dependent on our resolution of certain other issues in these cases.

[3] The predecessor's name was changed to Parks Foundation in 1987 and the Oregon-chartered entity was merged into a newly created Nevada non-profit corporation in 2003.

nized Foundation as a tax-exempt organization described in section 501(c)(3) and further classified it as a private foundation as defined in section 509(a), a classification it retained throughout the years at issue. Mr. Parks has been the sole contributor to Foundation since its incorporation.[4] During the years at issue Foundation was governed by a board of directors consisting of Mr. Parks and two of his adult sons. The primary purposes of Foundation, as set out in its restated bylaws, include: (1) enhancing and promoting sport fishing and sport hunting; (2) promoting education by researching and presenting to the public issues of general interest or concern and by supporting alternative educational programs and institutions; and (3) supporting charitable organizations and activities, the goals of which Foundation wished to encourage and promote.

In its taxable years ended November 30, 1997 through 2000,[5] Foundation expended $65,000, $200,000, $33,011, and $341,062, respectively, to produce 30- and 60-second radio messages[6] and broadcast them on commercial radio stations in Oregon (radio messages). Mr. Parks approved all the foregoing expenditures. All were made to Gregg K. Clapper, the Clapper Agency, or radio stations as Mr. Clapper directed.[7] Mr. Clapper or the Clapper Agency produced the radio messages and arranged for their broadcast. The parties have stipulated that Mr. Clapper has a long history of involvement with Oregon politics and that the Clapper Agency produces and arranges for the broadcast of political advertisements.

---

[4] Mr. Parks contributed $1 million to Foundation in its taxable year ended November 30, 1999, and $200,000 in its taxable year ended November 30, 2000.

[5] For Federal tax purposes, Foundation used a taxable year ending November 30. Hereinafter, references to a specified year or taxable year of Foundation mean the 12-month period ended November 30 for the specified year. In the case of Mr. Parks, references to a specified year or taxable year are to the calendar year.

[6] Some portion of the 1999 expenditure was also for newspaper advertisements, as discussed *infra*.

[7] Foundation made the $65,000 expenditure in 1997 by means of a check made out to the "Are you having Trouble Hearing What We're Saying Committee". As the parties have stipulated that this $65,000 was used by Mr. Clapper or the Clapper Agency to produce the radio message and to purchase broadcasting air time from radio stations during 1997, the fact that a conduit was apparently employed to effect payment is not material.

*Oregon Ballot Measure Procedures*

The Oregon Constitution confers upon Oregon citizens the power of initiative, entitling them to propose statutes or amendments to their constitution (referred to as "measures") by petition, and to enact or reject them in elections, independent of the Oregon Legislative Assembly. Or. Const. art. IV, sec. 1. Amendments to the Oregon Constitution can also be proposed by the Legislative Assembly and referred to Oregon citizens for their approval or rejection at the next election. *Id.* art. XVII, sec. 1. Thus, measures come before Oregon citizens for approval or rejection in elections by "initiative" when originating from citizens' petitions and by "referral" when originating in the Legislative Assembly. *See* Or. Rev. Stat. Ann. sec. 250.005(3) (West 2015). Nine of the ten radio messages at issue in these cases were broadcast in the weeks or months preceding a statewide election in which Oregonians voted on measures proposed by initiative or referral.

During the years at issue the Oregon secretary of state was required to prepare a voters pamphlet [8] for every general and statewide special election and mail it to each mailing address in Oregon no later than 15, and subsequently 20, days before an election. [9] *Id.* secs. 251.026, 251.175(1). With

---

[8] The parties have stipulated various excerpts from the voters pamphlets prepared with respect to the ballot measures that respondent contends were the subject of the radio messages at issue. The parties' stipulations do not provide an explanation, however, of the statutorily prescribed procedures under which the contents of the voters pamphlets were prepared. In the Court's judgment, knowledge of these procedures is indispensable to determining the relevance and probative weight to be given the voters pamphlet excerpts that have been stipulated. Consequently, we have taken judicial notice of the Oregon statutes that governed the ballot measures at issue, including the statutorily prescribed procedures for developing the information that appeared in the voters pamphlets. The findings in this section are based on such judicial notice in addition to the parties' stipulations.

[9] For the elections at issue which occurred during 1997, 1998, and 1999, the secretary of state was required to mail the voters pamphlets no less than 15 days before the election. Or. Rev. Stat. sec. 251.175 (1995). For the election at issue which occurred during 2000, the Oregon secretary of state was required to mail the voters pamphlets no less than 20 days before the election. *Id.* (1999) (applicable for elections held after January 2, 2000).

respect to each initiative and referred measure on the ballot in a given election, the voters pamphlet was required to contain, inter alia, the ballot title of the measure, [10] an explanatory statement for the measure, and a statement estimating the direct financial impact on the State and local governments if the measure were enacted. [11] Or. Rev. Stat. sec. 251.185 (1993); *id.* sec. 251.185(1) (1999). [12]

A committee of five citizens was tasked with preparing the explanatory statement for a measure, Or. Rev. Stat. sec. 251.205(1) (1995); *id.* sec. 251.205(2) (1999), [13] which was required to be "impartial, simple and understandable" and "not exceed 500 words." Or. Rev. Stat. Ann. sec. 251.215(1) (West 2015). The proponents of a measure—the chief petitioners in the case of an initiative measure and the president of the senate and the speaker of the house of representatives in the case of a referred measure—were entitled to appoint

---

[10] A ballot title consisted of a caption that reasonably identified the subject matter of the measure; simple and understandable statements that described, respectively, the result if the measure were approved or rejected; and a concise and impartial summary of the measure and its major effect. Or. Rev. Stat. Ann. sec. 250.035(2) (West 2015). The attorney general was required to prepare the ballot title for initiative measures. *Id.* sec. 250.065. The Legislative Assembly had the option of preparing the ballot title for referred measures; and if it did not, the attorney general was required to do so. *Id.* sec. 250.075.

[11] During the years in issue, the financial impact statement was required to be jointly prepared by the Oregon secretary of state, the state treasurer, the director of the Oregon Department of Administrative Services, and the director of the Department of Revenue. Or. Rev. Stat. sec. 250.125(1) (1993); *id.* (1999). (The current statute is found at Or. Rev. Stat. Ann. sec. 250.125 (West 2015).) The Oregon secretary of state must also have conducted a hearing (with reasonable notice) to receive suggested changes or other information concerning a proposed financial impact statement, and the Oregon secretary of state, the state treasurer, the director of the Oregon Department of Administrative Services, and the director of the Department of Revenue must have considered the suggested changes or other information submitted. Or. Rev. Stat. sec. 250.127(2) and (3) (1995); *id.* (1999). (The current statute is found at Or. Rev. Stat. Ann. sec. 250.127(2) and (3) (West 2015).)

[12] The current statute is found at Or. Rev. Stat. Ann. sec. 251.185(1)(a)–(c) (West 2015).

[13] The current statute is found at Or. Rev. Stat. Ann. sec. 251.205(2) (West 2015).

the first two members to the committee;[14] the secretary of state appointed the next two members of the committee from among the opponents of the measure; and the four appointed committee members were to agree on the fifth member. Or. Rev. Stat. sec. 251.205(2)–(4) and (6) (1995); *id.* sec. 251.205(1)–(5) (1999).[15] In the absence of agreement, the secretary of state was authorized to appoint the fifth member. Or. Rev. Stat. sec. 251.205(4) (1995); *id.* sec. 251.205(5) (1999).[16]

The committee was required to file the explanatory statement with the secretary of state, who then was charged with holding a hearing to receive suggested changes and other information relating to the explanatory statement. Or. Rev. Stat. Ann. sec. 251.215(1) and (2) (West 2015). The committee was required to consider the suggestions and other information submitted at the hearing and could file a revised statement with the secretary of state.[17] *Id.* sec. 251.215(3). Any person dissatisfied with an explanatory statement for which suggestions were offered at the secretary of state's hearing could petition the Oregon Supreme Court seeking a different statement.[18] *Id.* sec. 251.235; *see, e.g.*, *Novick v. Bradbury*, 10 P.3d 254 (Or. 2000).

*Content and Context of the Radio Messages*

The content and context of each radio message at issue are described below, arranged by the year in which the expenditures for the messages were made.

---

[14] The president of the senate was required to appoint a senator, and the speaker of the house, a representative. Or. Rev. Stat. sec. 251.205(6)(b) (1995); *id.* sec. 251.205(1)(b) (1999). (The current statute is found at Or. Rev. Stat. Ann. sec. 251.205(1)(b) (West 2015).)

[15] The current statute is found at Or. Rev. Stat. Ann. sec. 251.205(1)–(5) (West 2015).

[16] The current statute is found at Or. Rev. Stat. Ann. sec. 251.205(5).

[17] The original and any revised explanatory statement was required to be approved by at least three members of the committee. Or. Rev. Stat. Ann. sec. 251.215(4) (West 2015). The explanatory statement was also required to indicate any dissenting member. *Id.*

[18] Draft ballot titles were subject to similar procedures. Or. Rev. Stat. Ann. secs. 250.067, 250.085 (West 2015).

*1997*

On the ballot in a May 20, 1997, statewide special election was Measure 49. The explanatory statement for Measure 49[19] described it as follows:

EXPLANATORY STATEMENT

In 1994, voters approved an amendment to the Oregon Constitution establishing requirements for work programs for state prison inmates. These provisions in the Oregon Constitution require state corrections officials to establish and operate work and on-the-job training programs so that all eligible inmates are engaged in these programs 40 hours per week. Due to a conflict between Oregon constitutional provisions and federal law, the Department of Corrections has shut down some of its most successful and productive prison industries programs.

This measure modifies existing state prison work program requirements in the Oregon Constitution. The measure does the following:

- Permits the state to continue to operate and expand Oregon's most successful prison industries in compliance with federal law. Allows development of additional prison industries programs.

On March 10, 1997, Foundation paid $65,000 for the production and broadcast on Oregon radio stations from March 12 through 14, 1997, of a radio message which presented the following script in narrative format:[20]

I'll bet you thought Oregon prisoners would be working 40 hours a week by now. Back in 1994, that's what voters overwhelmingly told the politicians to do.

But the governor and attorney general have said, NO, we're not gonna do it.

Attorney General Hardy Myers says the federal government doesn't like the way Oregon pays it's [sic] prisoners. And so, he and the Governor have decided to shut down the program entirely.

Some people just don't think criminals should spend much time in jail. They think they can be rehabilitated.

If they really wanted prisoners to work, they'd just change the way we to [sic] pay them.

---

[19] In contrast to the explanatory statements for the other measures considered in this Opinion, which were prepared by five-citizen committees pursuant to Or. Rev. Stat. Ann. sec. 251.215 (West 2015), the explanatory statement for Measure 49 was drafted and enacted by the legislature.

[20] The scripts of all radio messages have been reproduced herein as presented in the parties' stipulations, with apparent errors noted.

When Hardy Myers was Speaker of the House, he took credit for changing Oregon's criminal statutes. Those changes resulted in the average convicted murderer spending less than 7 years in jail.

That's why Oregon Voters had to step in and take control.

We said it loudly and clearly, "Put criminals in jail. Make 'em do their time, and work 'em while they're there."

What Oregon voters didn't say was, "Make a bunch of whiney excuses why you can't do what we want done."

Foundation's tax counsel was not asked to review or approve the content of this radio message.

*1998*

On September 25, 1998, Foundation paid $200,000 for the production and broadcast of four radio messages (in two sets of two) which aired on Oregon radio stations in October 1998. The first set of two radio messages expressly referred to Measure 61, a citizen-initiated measure on the ballot in Oregon's November 3, 1998, general election. The explanatory statement for Measure 61 described it as follows:

EXPLANATORY STATEMENT

This measure creates a statute that sets minimum sentences for "major crimes," as defined in this measure. In addition, the measure requires the imposition of an additional sentence of one to three years of imprisonment for any offender who is convicted of a "major crime" and who was convicted of one or more "major crimes" within the previous 10 years.

The measure requires that a presumed sentence of at least 14 months imprisonment be imposed for "major crimes" committed on or after January 1, 1999. * * *

\* \* \* \* \* \* \*

The mandatory additional sentence is one year if the offender has one previous conviction for one of the specified crimes within that period, two years if the offender has two previous convictions for the specified crimes within that period and three years if the offender has three or more previous convictions for the specified crimes within that period.

The mandatory additional sentence for previous convictions may not be reduced for any reason. * * *

The financial impact statement for Measure 61 reported:

ESTIMATE OF FINANCIAL IMPACT: The mandatory and presumptive sentences imposed under this measure are estimated to require 4,300 new prison beds by 2006, with direct state expenditures for prison construction and start-up of $470 million by 2006.

Direct state expenditures for prison operating costs and debt service are estimated at $21 million in 1999–2000 and $40 million in 2000–2001, growing to $125 million in 2005–2006. * * *

The first radio message referring to Measure 61, broadcast in October 1998, presented the following script in narrative format:

Back when John Kitzhaber was Senate President Legislation was passed that resulted in a convicted murderer, given a life sentence, actually serving less than 7 years in jail...

They said they didn't have enough jail space.

But then came Measure 11.[21]

It required mandatory sentences for violent criminals with no possibility of early release...and...it required the state to build enough jail space.

They said it would cost billions of dollars. But it didn't.

And since Measure 11, violent crime in Oregon has gone down.

And now Measure 61's on the ballot.

It requires mandatory sentences for criminals convicted of property crimes.

You live in Portland. You get your car stolen or your house burglarized there won't be jail...just probation.

If Measure 61 passes, that criminal goes to jail. And they'll have to build enough jail space to keep 'em... There'll be no early release.

It's Measure 61.

Paid for in the public interest by the Parks Foundation.

The second radio message referring to Measure 61, also broadcast in October 1998, presented the following script in narrative format:

The citizens, not the politicians, passed Measure 11 putting violent criminals in jail.

Up 'till then, a convicted murderer with a life sentence served less than 7 years.

They said it would cost billions. But, it didn't. And the crime rate went down.

And now ... Measure 61.

You live in Portland, you get your car stolen ... your house burglarized ... there won't be jail ... just probation.

---

[21] Measure 11 was passed by Oregon voters in 1994. It established mandatory minimum prison sentences for violent crimes.

With Measure 61, that criminal absolutely goes to jail ... and no early release.

(Measure 61.)

Pd for by the Parks Foundation.

Mr. Clapper provided drafts of the two Measure 61 radio messages to Foundation's tax counsel for his review and approval before their broadcast. With respect to the first message, the tax counsel sent Mr. Clapper a memorandum stating:

We have reviewed the text of radio spot M61#1. The Foundation is not permitted to support or oppose any political candidate or any ballot measures. Its role is to "educate" the public about issues of the candidates and the ballot measures. The conclusion of this radio spot is close to an endorsement of the ballot measure, but we do not think it goes too far. Nevertheless, you should try to maintain an unbiased posture even though the thrust of the information emphasizes the "positive" aspects of the ballot measure. Let us know if there is any other information you need.

There is no evidence that Foundation's tax counsel provided any written response with respect to the content of the second message addressing Measure 61.

The remaining two Foundation-funded radio messages broadcast in October 1998 both referred to "administrative rules". Also on the ballot for approval in the November 3, 1998, general election was Measure 65, a citizen-initiated measure that would have amended the Oregon Constitution to establish a procedure under which certain administrative rules promulgated by State agencies would be required to be reviewed and approved by the State legislature.

The explanatory statement for Measure 65 described it as follows:

EXPLANATORY STATEMENT

This measure would amend the Oregon Constitution to create a review and approval process of state agency administrative rules by the Legislative Assembly. Currently, no such process exists. This process is triggered when a petition signed by a specified number of qualified voters is filed with the Secretary of State.

Administrative rules are rules and regulations adopted by state agencies, boards and commissions that generally have the full force and effect of law.

The number of qualified voters who must sign the petition is equal to two percent of the total number of votes cast for all candidates for Gov-

ernor at the last gubernatorial election. The petition must specify the administrative rule or rules that the Legislative Assembly is required to review.

Upon being notified by the Secretary of State that a petition meeting the requirements of the measure has been filed, the President of the Senate must prepare a bill that would approve the administrative rule or rules specified in the petition. The President of the Senate must then introduce that bill at the next following regular session of the Legislative Assembly. If the petition is filed with the Secretary of State during a regular session, the bill must be introduced at the next following regular session.

After the introduction of the bill, the Legislative Assembly may amend the bill to approve only part of a specified rule. If the petition specifies more than one rule, the bill may be amended to approve fewer than all of the specified rules. Any rule or part of a rule that is not approved by the passage of a bill has no further force or effect after the session is adjourned.

The first radio message referring to "administrative rules" presented the following script in narrative format:

Right now, without even knowing it, you're being forced to live under laws created not by elected officials but by non-elected government bureaucrats.

They're called administrative rules.

Here's what happens:

The legislature passes a law to keep a watchful eye on growth and tells its hired workforce to carry out that law.

So Jack and Bev Stewart turn 90 acres of Polk County brush piles into a horse farm. Because horses are expensive and easily stolen, they want to build a farmhouse so they can be there. But the government bureaucrats say no, we're not gonna let you until you earn $80,00 [sic] off the property. The Stewarts say. We can't do that until we get more horses...the bureaucrats say tough, that's your problem, not ours.

When a legislator's asked how government can get away with this he says we never intended for this to happen.

So the Stewarts are stuck...all they did was turn 90 acres of noxious weeds into income producing, taxpaying farm acreage.

It's called administrative rules...and you're gonna hear a lot more about 'em in the weeks to come.

The second radio message referring to "administrative rules" presented the following script in narrative format:

Right now, without even knowing it, you're being forced to live under laws created not by elected officials but by non-elected government bureaucrats.

They're called administrative rules.

Here's what happens:

The Good Sheppard [sic] Church of Clackamas County purchased the only available piece of land in the area to build a new church. It's zoned for farm use. But even though the elected legislature passed a state law allowing churches to build on farmland, the nonelected bureaucrats made up an administrative rule saying, we're not going to let you do it. And it doesn't matter whether the land is any good or not.

So in the mean time [sic], the Good Shepherd Church has been denied a building permit on their own land even though state law says it's OK.

It's called administrative rules ... and you're gonna hear a lot more about 'em in the weeks to come.

Mr. Clapper also provided drafts of the two radio messages referring to "administrative rules" to Foundation's tax counsel for his review and approval before their broadcast. In response, the tax counsel sent Mr. Clapper a memorandum which in full stated as follows: "We have reviewed the texts of spots labeled M65–1 and M65–2. They appear to comply with the 'public education' purpose of the Parks Foundation. If you have further questions, please contact us."

*1999*

In the November 5, 1996, general election, Oregon voters approved Measure 40, which granted victims of crime a variety of constitutional rights with respect to the prosecution of criminal defendants. In 1998, however, the Oregon Supreme Court found Measure 40 void in its entirety because it was not passed in compliance with article XVII, section 1 of the Oregon Constitution, which requires a separate vote for each distinct constitutional amendment. *See Armatta v. Kitzhaber*, 959 P.2d 49 (Or. 1998). In response, the elements of Measure 40 were divided by the Oregon Legislative Assembly into separate measures for referral to the voters for reapproval. Measures 69 through 75 were seven of the constituent parts of Measure 40 so referred, and they appeared on the ballot in Oregon's November 2, 1999, statewide special election.

The measures sought to make the following amendments to the Oregon Constitution: Measure 69 granted victims constitutional rights in criminal prosecutions and juvenile court delinquency proceedings; Measure 70 gave the public, through the prosecutor, the right to demand a jury trial in

criminal cases; Measure 71 limited pretrial release of accused persons to protect victims and the public; Measure 72 allowed murder convictions by 11 to 1 jury votes; Measure 73 limited immunity from criminal prosecutions for persons ordered to testify about their conduct; Measure 74 required that the terms of imprisonment announced in court be fully served, with certain exceptions; and Measure 75 banned persons convicted of certain crimes from serving on grand juries and criminal trial juries.

On June 2, 1999, Foundation paid $10,963 for the production and broadcast of two radio messages and the production and publication of a print advertisement in two newspapers. Combined, the radio messages aired 222 times on Oregon radio stations. The first radio message presented the following script in narrative format:

> District 5 State Representative Jim Hill is one of the very few Republicans in the state house fighting against the victims of crime.
>
> 2 years ago, a wide majority of Oregonians voted to get tough on criminals by passing Measure 40.
>
> But the liberal state Supreme Court threw it out saying it contained too many subjects. The state house has just voted to split Measure 40 into 8 separate amendments to be reapproved by the voters.
>
> Who would be against this?
>
> The liberals and criminal defense lawyers.
>
> Some Democrats joined with most of the Republicans to support victims' rights . . . very few Republicans didn't.
>
> Your district 5 State Representative Jim Hill is one of them.
>
> Many victims of crime urged the passage of Measure 40 because they wanted the victims to be treated at least as well as the criminals.
>
> But Jim Hill fought us all the way.
>
> The Parks Foundation paid for this message because we want you to know what your elected officials really do once they get to Salem.

The second radio message was identical to the first except that it substituted District 34 State Representative Lane Shetterly for Representative Hill. [22]

---

[22] A copy of the print advertisement is not in the record, but the parties stipulated that it was similar to the radio messages. Consequently our findings with respect to the expenditure for the radio messages apply equally to any portion devoted to the print advertisements.

In addition, on July 23, 1999, Foundation paid $22,048 for the production and broadcast of a third radio message (Communication #8 [23]) which referred by name to Measure 11, a ballot measure that had been passed in 1994 enacting a statute setting mandatory minimum sentences for certain violent crimes. Several bills which sought to amend the Measure 11 statute were introduced during the regular session of the Oregon Legislative Assembly in the spring and summer of 1999. The Communication #8 radio message presented the following script in narrative format:

Portland Police have just arrested 32-year-old Todd Reed for the gruesome serial murders of 3 women.

But what about Todd Reed's criminal history? In '81 he was convicted of burglary. In '82, burglary. In '87 convicted of 3 more burglaries. In '92 he was arrested for 3 counts of rape, 2 counts of sodomy, 5 counts of kidnaping, I [sic] count each sex abused [sic] and menacing.

After plea-bargaining he got a 17-year sentence. But this was Oregon before Measure 11. He spent 2 years in jail. But if he was under Measure 11, there'd be no early release; he'd still be in jail.

The State Senate just voted to allow some violent Measure 11 convicts a 15% reduction in prison time.

Now, who would do that?

From the Portland area, Senators Kate Brown, Ginny Burdick and Frank Shields.

And the one most responsible, Neil Bryant of Bend.

The Parks Foundation paid for this because we want you to know what the politicians really do once they get to Salem.

Drafts of the three radio messages Foundation funded in 1999 were provided to Foundation's tax counsel for his review and approval, but there is no evidence that he provided any written response with respect to the content of the messages.

Foundation's tax counsel sent Mr. Parks a letter dated October 14, 1999. At that time, Foundation was the subject of an investigation by the Oregon attorney general concerning, inter alia, its expenditures for the broadcast of radio advertisements. The investigation had commenced sometime

---

[23] The parties refer to this radio message as Communication #8, and we shall as well.

before March 12, 1998. [24] The letter referenced the Oregon attorney general's investigation and the poor prospects of reaching any mutually agreeable settlement with that office. The letter went on to specifically address Foundation's practice of sponsoring "information ads on radio and in newspapers" in the excerpts which follow.

> Sponsoring your own public information ads has produced the most ardent response from the Attorney General * * * . The law prohibits a private foundation form engaging in any activities intended to "affect the outcome of an election," in other words, from lobbying. There are two forms of political activity that meet the test. They should be clearly distinguished in your mind when the ads are being produced and circulated because each has a slightly difference compliance standard.
>
> The two forms of lobbying are called "direct lobbying" and "grass roots lobbying".

After explaining the difference between direct and grass roots lobbying, the letter turned specifically to ballot measure initiatives, in the following excerpt.

> Until this year [1999], most of your activities have focused on the initiative process. The law takes the view that the voters are the legislature when deciding a [sic] initiative ballot issue. Thus, communicating with the voters about an initiative issue is direct lobbying, rather than grass roots lobbying. The requirement for urging a particular vote or to contact a legislator is not required. This is why the Attorney General is so adamant about condemning your activities; they believe you are engaging in direct lobbying: you refer to a specific bill or act (even when you don't), and you are expressing a point of view. * * * a simple exception to these lobbying rules [exists] which permits the expression of a point of view if the message is "educational". This is where the "gray area" comes in, and it is the arena in which the main battle with the Attorney General will be waged.
>
> It is not possible to express a "general rule" for you to follow in your political efforts. Instead, we urge you to simply stay focused on the facts. Do not succumb to emotion or generalizations of "good" or "bad" or "conservative" or "liberal." It is certainly acceptable to use humor, sarcasm and imagery as long as they do not obscure the factual basis of your message.

---

[24] March 12, 1998, is the date of the earliest email in the record from a financial investigator from the Oregon Department of Justice to Foundation's tax counsel. The subject of the email concerned the investigator's efforts to obtain the scripts of radio and newspaper advertisements prepared for Foundation by Mr. Clapper, and the email reflected efforts to obtain the scripts that had preceded the date of the email.

*2000*

In 2000 Foundation expended $341,062 to produce and broadcast two radio messages. The messages were broadcast before the Oregon general election held on November 7, 2000. Appearing on the ballot of that election was Measure 8, an initiative measure. The explanatory statement for Measure 8 described it as follows:

EXPLANATORY STATEMENT

Ballot Measure 8 would amend the Oregon Constitution by linking the rate of growth of state government spending to the rate of growth of personal income in the state. The measure would limit all state spending, regardless of the source of the funds, to no more than 15 percent of total personal income of Oregonians earned in the two calendar years immediately preceding the budget period (biennium).

If the state collects revenues in excess of the limit, the measure would require that those excess revenues be distributed to Oregon taxpayers in proportion to the income taxes they paid in the biennium. Excluded from this distribution are earnings from dedicated investment funds, such as retirement funds or the Common School Fund.

The Legislature could vote to increase spending beyond the limit, but only if the Governor specifically declares an emergency, and three-fourths of the elected members of both the House and the Senate vote for the increased level of spending.

The limit covers state spending from all sources of funds, such as taxes, fees, federal funds, and investment earnings. The measure would exclude from the limit proceeds from state-issued bonds, although it does include the funds appropriated to repay those bonds.

For comparison, the state has recently experienced a spending level of about 18 percent of personal income. The estimated impact of the measure on the 2001–2003 state budget would be to limit expenditures to an amount $5.7 billion less than the projected spending of $32.4 billion.

The measure limits state spending. The measure does not cut state taxes, nor does it direct the Legislature or Governor how state funds are spent within the new limit.

The first of the two radio messages, broadcast sometime before late August 2000, presented the following script in narrative format:

Is Oregon State government really growing nearly 3 times faster than the personal income of those who pay its bills?

Oregonians will soon be asked if they want to slow down the growth of their State government.

Here are the facts. From 1989 to 91 State government grew by 21%, citizen income grew less than 9%. In 93 State income up 20%, citizens'

income just 11%. In 95 State incomes up another 23%, private pay up less than 11%. And in 97 the State income was up 14% and private pay just 8%.

So what all this means is that over the last 10 years the State increased its income by more than 130%, while private pay increased less than 50%.

Our Tax dollars to State government have increased nearly 3 times faster than the personal income of its own citizens. And those are the State's own figures.

Paid for by the Parks Foundation.

On August 25, 2000, Oregon's largest newspaper (by circulation) published an article addressing the claims made in the radio message. *See* James Mayer, "Ad's View of State Budget Disputed as Incomplete", Oregonian, August 25, 2000, at C1.[25] The article reported on the radio message as follows:

Summary: A radio spot paid for by the Parks Foundation says the state tax has grown 3 times faster than residents' personal income.[26]

Conservative businessman Loren Parks has thrown the first punch in this year's ballot fight about taxes and government spending, launching a statewide radio ad that claims Oregon's budget has grown three times faster than personal income in the past decade.

But the 60-second spot, paid for by the Parks Foundation, fails to account for inflation, population growth or the decade-long shift in school finance from local property taxes to the state budget.

---

[25] The newspaper article is a stipulated exhibit, and the parties stipulated its authenticity. The parties stipulated that either had the right to object to the admission of any stipulated exhibit "on the grounds of relevancy and materiality, but not on other grounds unless expressly reserved herein." In the stipulations, petitioners reserved an objection to the article on the basis of "evidentiary relevance" alone.

While statements in the article are hearsay, petitioners have not objected on that ground and have therefore waived any such objection. *See* Fed. R. Evid. 103(a)(1); *United States v. Jamerson*, 549 F.2d 1263, 1266–1267 (9th Cir. 1977); *Feder v. Commissioner*, T.C. Memo. 2012–10; *Estate of Smith v. Commissioner*, T.C. Memo. 2001–303, *aff'd*, 54 F. App'x 413 (5th Cir. 2002). Statements in newspaper articles that have been admitted without a hearsay objection may be considered for their probative value. *Garcia v. Commissioner*, T.C. Memo. 1989–106; *Kenerly v. Commissioner*, T.C. Memo. 1984–117. We overrule petitioners' relevancy objection.

[26] The article also reported that Mr. Clapper had advised in an interview that the figures used in the radio message for State revenue and personal income were from Oregon Tax Research, a think tank.

Considering those factors, growth in state spending has actually been slower than personal income growth in the 1990s.

Specifically, with respect to the radio message's claim that over the past 10 years Oregon State revenues had risen by more than 130% while personal income had risen by only 50%, the article states:

The comparison is flawed, however, because one figure—personal income—is adjusted for population, while the other—spending—is not.

Without adjusting for population, personal income grew by 87 percent in the same period, which is closer to the 130 percent rise in the budget.

And by focusing on the general fund, the ad gives voters a misleading picture of * * * [Measure 8], which limits total state spending, not just the general fund. The state's "all funds" budget, which includes federal funds, the gas tax and licenses and other user fees, increased 108 percent in the past 10 years.

The article further explains that much of the increase in State spending over the past 10 years was attributable to a 1990 citizen-initiated measure that limited local property taxes, thereby shifting primary responsibility for financing public schools from localities to the State. The article concluded:

Accounting for the shift in school funding by adding in all school property taxes, adjusting for population growth and factoring in inflation turns the claim in the Parks' radio ad on its head.

Adjusted figures show that per capita state spending increased only 4 percent over the last decade, far less than the 18 percent increase in per capita personal income.

On August 24, 2000, the Oregon Department of Justice, Charitable Activities Section, filed a lawsuit against Foundation, alleging that Foundation had made expenditures from 1993 through 2000 that constituted taxable expenditures under section 4945, thereby violating Oregon's Nonprofit Corporation Act, Or. Rev. Stat. sec. 65.036(5) (1999). The Oregon attorney general's audit of Foundation, a principal focus of which was Foundation's expenditures for radio advertisements, had been ongoing since at least March 1998, and Foundation's tax counsel and the Oregon attorney general's office had made efforts to settle the matter in 1999. In October 1999, Foundation's tax counsel advised Mr. Parks in a letter that reaching a mutually agreeable settlement with

the attorney general's office concerning the issues raised in the audit was unlikely.

After the filing of the foregoing lawsuit, Foundation arranged for the production and broadcast of the second radio message at issue for 2000. The message presented the following script in narrative format:

> A few weeks ago, the Parks Foundation revealed that, over the last 10 years, Oregon government income has grown by 130%, nearly 3 times faster than the personal income of citizen's who pay for it.
>
> The state government didn't like what we said. They filed a lawsuit against us.
>
> But, like it or not, the general fund budget has gone from $4 to $10 billion.
>
> And where's that money gone?
>
> A big part of it goes to the Oregon Health plan that just paid a quarter million dollars for a convicted child molester from Mexico to receive a bone marrow transplant ... .
>
> And 2 brain surgeries for an out of state man...
>
> Gall bladder surgery for an out of state woman...And 2 knee replacements for a skier who lives off a trust fund but said he had no income.
>
> The state government is using taxpayers' money to intimidate us from revealing this kind of information.
>
> Isn't that what Richard Nixon did when he used the IRS to go after his political enemies?
>
> Paid for by the Parks Foundation.

Drafts of both radio messages were provided to Foundation's tax counsel for his review and approval, but there is no evidence that he provided a written response with respect to the content of the messages.

*Examination and Request for Correction*

Neither Foundation nor Mr. Parks filed a Form 4720, Return of Certain Excise Taxes Under Chapters 41 and 42 of the Internal Revenue Code, for any of the years at issue. Respondent conducted an examination of Foundation's Forms 990–PF, Return of Private Foundation, for the years at issue, and on October 16, 2002, respondent's revenue agent sent a letter to Foundation's tax counsel advising of her conclusion that Foundation's expenditures for the radio messages were taxable expenditures within the meaning of section 4945(d) and of her intention to propose liabilities under section

4945(a)(1) for Foundation and under section 4945(a)(2) for Mr. Parks as a foundation manager. The letter further advised that the agent intended to propose liabilities under section 4945(b)(1) for Foundation and under section 4945(b)(2) for Mr. Parks as foundation manager. Citing *Thorne v. Commissioner*, 99 T.C. 67 (1992), the revenue agent formally requested that Mr. Parks correct the expenditures.[27] By letter dated November 11, 2002, Foundation's tax counsel advised the revenue agent that Mr. Parks refused to make the requested correction.

*Deficiency Determinations*

In a notice of deficiency issued to Foundation on December 22, 2006, respondent determined that Foundation's expenditures for radio messages of $65,000, $200,000, $33,011, and $341,062 for its 1997–2000 taxable years, respectively, were taxable expenditures under section 4945, resulting in liability for excise tax deficiencies under section 4945(a)(1) and, because the taxable expenditures had not been corrected, under section 4945(b)(1) for each year.[28] In a notice of deficiency issued to Mr. Parks that same day, respondent determined that as a result of the foregoing expenditures, Mr. Parks was liable for excise tax deficiencies under section 4945(a)(2) and, because the taxable expenditures had not been corrected, under section 4945(b)(2) for each of the foregoing years. Both petitioners timely petitioned for redetermination, and their cases were consolidated.

## *Discussion*

I. *Private Foundations and Excise Tax Enforcement*

Provisions exempting charitable organizations from taxation have been included in every income tax act since the adoption of the Sixteenth Amendment,[29] *see* Revenue Act of

---

[27] The revenue agent proposed that, under the circumstances, correction could be accomplished by Mr. Parks' reimbursing Foundation for the taxable expenditures.

[28] The notice of deficiency determined that Foundation's excise tax liability under sec. 4945(b)(1) for 1999 is $33,012, a figure that is $1 more than the amount the parties have stipulated was Foundation's total expenditure for radio messages in that year.

[29] The Act of August 27, 1894, ch. 349, sec. 32, 28 Stat. at 556–557, also

1913, ch. 16, sec. II(G), 38 Stat. at 172; *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 589 n.14 (1983), and since 1917 individual taxpayers have been allowed a deduction for contributions to certain charitable organizations,[30] *see* War Revenue Act of 1917, ch. 63, sec. 1201(2), 40 Stat. at 330. However, in the Tax Reform Act of 1969 (1969 Act), Pub. L. No. 91–172, 83 Stat. 487, Congress enacted a new statutory regime for a subset of section 501(c)(3) organizations, designated "private foundations" and defined for the first time in that legislation as, generally speaking, all organizations exempt from tax under section 501(c)(3) *except* churches, schools, hospitals and medical research organizations, or other charitable organizations receiving a substantial portion of their support from the general public or governmental sources (public charities). Sec. 509(a). Congress concluded that private foundations, typically subject to the control of a single individual, family, or small group of persons, were especially susceptible to having their resources diverted to serve private rather than charitable purposes, thereby subverting the rationale for according them tax-exempt status and the benefits of being eligible to receive tax-deductible contributions. *See* S. Rept. No. 91–552, at 57 (1969), 1969–3 C.B. 423, 460.

Consequently, in subchapter A of chapter 42 of the Internal Revenue Code, Congress imposed stricter rules on private foundations as compared to public charities generally, including excise taxes on self-dealing transactions and on failures to distribute income. *See* secs. 4941 and 4942. Of particular relevance to these cases, in contrast to public charities—which are allowed to engage in "carrying on propaganda, or otherwise attempting, to influence legislation" so long as the foregoing is not "a substantial part of the activities" of the organization, *see* sec. 501(c)(3), a private foundation is subject to excise taxes if it expends "any amount * * * to carry on propaganda, or otherwise to attempt, to

included a provision exempting charitable organizations from tax, but the income tax system provided for in the Act was declared unconstitutional. *Pollock v. Farmers' Loan & Tr. Co.*, 158 U.S. 601 (1895).

[30] During the years at issue (and currently), sec. 170(a) allowed a deduction, subject to certain limitations and verification requirements, for contributions to domestic sec. 501(c)(3) organizations (except organizations testing for public safety) paid during the taxable year.

influence legislation", sec. 4945(d)(1); [31] *see* sec. 4945(a) and (b). Of further relevance to these cases, these excise taxes also apply if a private foundation expends any amount for "any purpose other than one specified in section 170(c)(2)(B)"; namely, "religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition * * * or for the prevention of cruelty to children or animals". Sec. 4945(d)(5).

Congress also concluded that a different enforcement mechanism—the aforementioned excise taxes—was appropriate for private foundations. Whereas the principal enforcement mechanism for tax-exempt organizations at the time of enactment of the 1969 Act had been revocation of tax-exempt status (and the attendant forfeiture of eligibility to receive tax-deductible contributions), Congress believed that loss of exemption was an ineffective sanction in the case of private foundations. Instead, Congress chose to impose excise taxes on expenditures by private foundations that it determined should be proscribed, reasoning that such an approach would be both more effective and more proportionate to the infraction than loss of tax-exempt status. With respect to the excise taxes, the Finance Committee report states:

> The committee has concluded that more effective limitations [than loss of tax exemption and denial of charitable contribution deduction status] must be placed on the extent to which tax-deductible and tax-exempt funds can be dispensed by private persons and that these limitations must involve more effective sanctions. Accordingly, the committee has determined that a tax should be imposed upon expenditures by private foundations for activities that should not be carried on by exempt organizations (such as lobbying, electioneering, and "grass roots" campaigning). * * * [S. Rept. No. 91–552, *supra* at 48, 1969–3 C.B. at 455.]

The Ways and Means Committee report contains substantially identical language and further observes that "the [excise tax] sanction will in most cases be far more proportional to the impropriety than is the case under present law [providing only the sanction of loss of tax-exempt status]." H.R. Rept. No. 91–413, at 31–36 (1969), 1969–3 C.B. 200, 221–223. [32] Public charities were excepted from the stricter

---

[31] As will be discussed in greater depth hereinafter, the provisions applicable to private foundations further define what constitutes an "attempt to influence legislation". *See* sec. 4945(e).

[32] The House version of the legislation would have imposed an excise tax

rules and excise taxes "on the theory that their exposure to public scrutiny and their dependence on public support would keep them from the abuses to which private foundations were subject." *Quarrie Charitable Fund v. Commissioner*, 603 F.2d 1274, 1277 (7th Cir. 1979), *aff'g* 70 T.C. 182 (1978); *see also* H.R. Rept. No. 91–413, *supra* at 39–42, 1969–3 C.B. at 226–227.

II. *Petitioners' Liability for Excise Taxes Under Section 4945*

Section 4945 imposes four distinct excise taxes on "taxable expenditures" of private foundations. A "taxable expenditure" is any amount paid or incurred by a private foundation for any of the prohibited purposes listed in paragraphs (1) through (5) of section 4945(d). Those purposes include: "to carry on propaganda, or otherwise to attempt, to influence legislation" and "for any purpose other than one specified in section 170(c)(2)(B)". Sec. 4945(d)(1), (5).

Section 4945(a)(1) imposes a tax on the foundation itself equal to 10%[33] of the amount of each taxable expenditure made by the foundation. Section 4945(a)(2) imposes a tax equal to 2.5% of a taxable expenditure on any "foundation manager" who agrees "to the making of an expenditure, knowing that it is a taxable expenditure * * * unless such agreement is not willful and is due to reasonable cause."[34] A "foundation manager" for this purpose includes an officer, director, or trustee of the foundation (or an individual having powers or responsibilities similar to those of the foregoing). Sec. 4946(b). The subsection (a)(1) and (2) taxes are designated as "first tier" taxes. Sec. 4963(a).

More severe "second tier" taxes are imposed by section 4945(b)(1) and (2) when taxable expenditures are not timely

on a private foundation equal to 100% of the prohibited expenditure and an excise tax equal to 50% of the prohibited expenditure on the foundation manager. The two-tiered excise taxes in current law originated in the Senate version and were adopted in the conference version of the legislation. *See* H.R. Conf. Rept. No. 91–782, at 286 (1969), 1969–3 C.B. 644, 649.

[33] The rate of tax imposed by sec. 4945(a)(1) increased to 20% for taxable expenditures in years beginning after August 17, 2006. Pension Protection Act of 2006 (PPA), Pub. L. No. 109–280, sec. 1212(e)(1)(A), (f), 120 Stat. at 1074–1075.

[34] The rate of tax imposed by sec. 4945(a)(2) increased to 5% for expenditures in taxable years beginning after August 17, 2006. PPA sec. 1212(e)(1)(B), (f), 120 Stat. at 1074–1075.

"corrected".[35] The second tier tax on the private foundation is equal to 100% of the amount of the taxable expenditure. Sec. 4945(b)(1). When a second tier tax is imposed on the foundation, a second tier tax, equal to 50% of the taxable expenditure, is likewise imposed on any foundation manager who "refused to agree to part or all of the correction". Sec. 4945(b)(2).

Respondent determined that Foundation's payments for the production and broadcast of the radio messages were taxable expenditures.[36] He further determined that Foundation and Mr. Parks were both liable for first and second tier excise taxes on the expenditures. Petitioners argue that they are not liable for excise taxes because the expenditures for the radio messages were not taxable expenditures. They also argue that section 4945 and the regulations thereunder, as applied to them, are unconstitutionally vague and violate their First Amendment rights.

We begin by considering the application of each excise tax.

---

[35] "Correction" for this purpose means recovery of the expenditure to the extent possible or, where recovery is not possible, such additional corrective action as is prescribed by regulations. Sec. 4945(i). A correction will prevent the imposition of the second tier tax if it is made before the earlier of the date on which a notice of deficiency determining the first tier tax is mailed or the first tier tax is assessed. Sec. 4945(b)(1) and (2), (i)(2).

If the second tier tax is imposed, a correction may still be made during a correction period that in general runs from the date of the taxable expenditure until 90 days after the date of mailing of a notice of deficiency, extended by any period during which the deficiency cannot be assessed under sec. 6213(a). *See* secs. 4961(a), 4963(e). If correction occurs within the correction period, then the second tier tax shall not be assessed; if it is assessed, the assessment shall be abated, and if collected shall be credited or refunded as an overpayment. Sec. 4961(a). The correction period provided in sec. 4963(e) enables a taxpayer to obtain Tax Court review of the determination to impose the first and second tier taxes before making the correction (and thereby avoiding liability for the second tier tax). *See Thorne v. Commissioner*, 99 T.C. 67, 95 (1992).

[36] On brief respondent explains that because Foundation's records did not permit him to segregate the costs attributable to the individual radio messages in years when multiple messages were produced, he treated Foundation's aggregate payments for the messages in each year as a single expenditure. Accordingly, respondent determined Foundation made four taxable expenditures, one in each of its taxable years at issue.

A. *Section 4945(a)(1)*

Respondent determined excise tax deficiencies under section 4945(a)(1) for Foundation of $6,500, $20,000, $3,301, and $34,106 for its 1997, 1998, 1999, and 2000 taxable years, respectively. Respondent argues first that Foundation's expenditures for the radio messages (except Communication #8) were taxable expenditures under section 4945(d)(1) because the messages were attempts to influence legislation. He further argues in the alternative that all of the expenditures for the radio messages (including Communication #8) were taxable expenditures under section 4945(d)(5) because the expenditures were for nonexempt purposes.

Foundation bears the burden of proving the expenditures were not taxable expenditures. *See Thorne v. Commissioner*, 99 T.C. at 87; *Larchmont Found., Inc. v. Commissioner*, 72 T.C. 131, 136 (1979), *vacated and remanded on other grounds*, 659 F.2d 1085 (7th Cir. 1981).

1. *Attempts To Influence Legislation*

Under section 4945(d)(1) any amount paid by a private foundation "to carry on propaganda, or otherwise to attempt, to influence legislation, within the meaning of subsection (e)" is a taxable expenditure. Section 4945(e) provides:

> SEC. 4945(e). ACTIVITIES WITHIN SUBSECTION (d)(1).—For purposes of subsection (d)(1), the term "taxable expenditure" means any amount paid or incurred by a private foundation for—
>
> (1) any attempt to influence any legislation through an attempt to affect the opinion of the general public or any segment thereof, and
>
> (2) any attempt to influence legislation through communication with any member or employee of a legislative body, or with any other government official or employee who may participate in the formulation of the legislation (except technical advice or assistance provided to a governmental body or to a committee or other subdivision thereof in response to a written request by such body or subdivision, as the case may be),
>
> other than through making available the results of nonpartisan analysis, study, or research. * * *

Section 53.4945–2(a)(1), Foundation Excise Tax Regs., further defines attempts to influence legislation for purposes of the section 4945 excise taxes by incorporating provisions of the regulations interpreting that phrase as used in section 4911(d), applicable to certain electing public charities. *See*

secs. 501(h), 4911.[37] Section 53.4945–2(a)(1), Foundation Excise Tax Regs., generally provides that an expenditure is an attempt to influence legislation if it is for a "direct or grass roots lobbying communication, as defined in § 56.4911–2 (without reference to §§ 56.4911–2(b)(3) and 56.4911–2(c)) and § 56.4911–3", unless it constitutes nonpartisan analysis, study, or research, or technical advice given to a governmental body in response to a written request.

A "direct lobbying communication" is any attempt to influence any legislation through communication with:

> (A) Any member or employee of a legislative body; or
> (B) Any government official or employee (other than a member or employee of a legislative body) who may participate in the formulation of the legislation, but only if the principal purpose of the communication is to influence legislation.
> [Sec. 56.4911–2(b)(1)(i), Pub. Charity Excise Tax Regs.]

Such a communication will be treated as an attempt to influence legislation only if it "refers to specific legislation" and "reflects a view on such legislation". *Id.* subdiv. (ii).[38] "Legislation" is defined in the regulations as including "action by * * * any state legislature * * * or by the public in a referendum, ballot initiative, constitutional amendment, or similar procedure."[39] *Id.* para. (d)(1)(i). For this purpose, "'specific legislation' includes both legislation that has already been introduced * * * and a specific legislative proposal that the organization either supports or opposes." *Id.*

---

[37] The regulatory definitions of expenditures that are attempts to influence legislation—so-called lobbying expenditures—were made the same for public charities electing under sec. 501(h) and private foundations subject to excise taxes under sec. 4945 because of "the similarity of the statutory schemes" governing lobbying by each. T.D. 8308, 1990–2 C.B. 112, 114; *cf.* secs. 4945(e), 4911(d).

[38] A "grass roots lobbying communication" is "any attempt to influence any legislation through an attempt to affect the opinions of the general public or any segment thereof." Sec. 56.4911–2(b)(2)(i), Pub. Charity Excise Tax Regs. A communication will be considered a grass roots lobbying communication only if it refers to and reflects a view on specific legislation or a specific legislative proposal and in addition encourages the recipient of the communication to take action with respect to such legislation. *Id.* paras. (b)(2)(ii), (d)(1)(ii).

[39] The term "action" in para. (d)(1)(i) of the regulation "is limited to the introduction, amendment, enactment, defeat or repeal of acts, bills, resolutions, or similar items." Sec. 56.4911–2(d)(2), Pub. Charity Excise Tax Regs.

subdiv. (ii). Thus, as the regulations clarify, a "specific legislative proposal" may be "specific legislation" for this purpose even though it has not actually been introduced in the legislative body for the jurisdiction where the communication is made. [40]

The regulations treat communications with the general public regarding ballot measures as "direct lobbying communications".

> (iii) Special rule for referenda, ballot initiatives or similar procedures.—Solely for purposes of this section 4911 [of the regulations], where a communication refers to and reflects a view on a measure that is the subject of a referendum, ballot initiative or similar procedure, the general public in the state or locality where the vote will take place constitutes the legislative body, and individual members of the general public are, for purposes of this paragraph (b)(1), legislators. Accordingly, if such a communication is made to one or more members of the general public in that state or locality, the communication is a direct lobbying communication (unless it is nonpartisan analysis, study or research * * * ). [Sec. 56.4911–2(b)(1)(iii), Pub. Charity Excise Tax Regs.]

However, such a ballot measure does not become "specific legislation" under the regulations until the petition seeking its placement on the ballot is first circulated.

> In the case of a referendum, ballot initiative, constitutional amendment, or other measure that is placed on the ballot by petitions signed by a required number or percentage of voters, an item becomes "specific legislation" when the petition is first circulated among voters for signature. [*Id.* para. (d)(1)(ii).]

This special rule governing when ballot measures become "specific legislation" applies to measures "that * * * [are] placed on the ballot by petitions signed by a required number or percentage of voters". *Id.* The regulations are silent with

---

[40] A regulatory example illustrates that a "specific legislation proposal" can be "specific legislation", capable of being influenced by a lobbying communication, notwithstanding that it has not been introduced in the legislative body where the communication is made.

> An organization based in State A notes in its newsletter that State Z has passed a bill to accomplish a stated purpose and then says that State A should pass such a bill. The organization urges readers to write their legislators in favor of such a bill. No such bill has been introduced into the State A legislature. The organization has referred to and reflected a view on a specific legislative proposal and has also encouraged readers to take action thereon. [Sec. 56.4911–2(d)(1)(iii), *Example* (2), Pub. Charity Excise Tax Regs.]

respect to a referendum, ballot initiative, constitutional amendment, or similar measure that is placed on the ballot by action of a legislature. [41]

_____

[41] The regulations' treatment of a petition-initiated ballot measure as becoming "specific legislation" when the petition is first circulated is thus a temporal standard. In finalizing these same regulations, however, the Secretary expressly rejected a temporal standard for determining when legislation (other than petition-initiated ballot measures) becomes "specific legislation", finding that such a standard would be underinclusive by failing to cover legislation not yet introduced. *See* T.D. 8308, 1990–2 C.B. at 114. Given the regulations' silence concerning the standard to be applied in determining when ballot measures initiated by a legislature become "specific legislation", difficult questions of interpretation could arise.

The radio messages at issue for 1998 and 2000 were (according to respondent's position) addressed to petition-initiated ballot measures; namely, Measures 61 and 65 in 1998 and Measure 8 in 2000. On the stipulated facts, it is beyond dispute that the expenditures at issue were made, and the radio messages were broadcast, *after* petitions were first circulated to place the ballot measures on the ballot. Thus, the ballot measures were "specific legislation" within the meaning of the regulations at that time. (With respect to Measure 61 in 1998, the radio messages referred to it by name, which obviously meant the petition effort had not only started by then but had been successful. Similarly, correspondence between Foundation and its tax counsel before broadcast of the second set of radio messages in 1998 referred to them as "M65–1" and "M65–2", which persuades us that successful petitions to place Measure 65 on the ballot had already circulated at that time. With respect to Measure 8 in 2000, the contemporaneous newspaper account in the record persuades us that Measure 8 had been placed on the ballot at the time the 2000 radio messages were paid for and broadcast, demonstrating that the petitions to place Measure 8 on the ballot had already been circulated at that time.)

The radio message at issue for 1997 and two of them for 1999 were (according to respondent's position) addressed to legislatively initiated ballot measures; namely, Measure 49 in 1997 and Measures 69 through 75 in 1999. Determining these ballot measures' status as "specific legislation" is less clear under the regulations. However, petitioners have not argued that these ballot measures (or the petition-initiated ones) were not "specific legislation" within the meaning of the regulations at the time the expenditures were made or the radio messages were broadcast. They have also not challenged the validity of the regulation that defines members of the general public as "legislators" in the case of a referendum, ballot initiative, or similar measures. Consequently, petitioners have waived any such arguments, and we assume for purposes of deciding these cases that the ballot measures at issue were "specific legislation" within the meaning of sec. 56.4911–2(d)(1), Pub. Charity Excise Tax Regs., when the radio messages were broadcast.

Under the regulations, a communication is not a "direct lobbying communication" if it constitutes "engaging in non-partisan analysis, study or research and making available to the general public or a segment or members thereof or to governmental bodies, officials, or employees the results of such work." Sec. 53.4945–2(d)(1)(i), Foundation Excise Tax Regs. The regulations define "nonpartisan analysis, study, or research" as follows:

> For purposes of section 4945(e), "nonpartisan analysis, study, or research" means an independent and objective exposition of a particular subject matter, including any activity that is "educational" within the meaning of § 1.501(c)(3)-1(d)(3). Thus, "nonpartisan analysis, study, or research" may advocate a particular position or viewpoint so long as there is a sufficiently full and fair exposition of the pertinent facts to enable the public or an individual to form an independent opinion or conclusion. On the other hand, the mere presentation of unsupported opinion does not qualify as "nonpartisan analysis, study, or research". [*Id.* subdiv. (ii).]

Thus, a communication to the general public which refers to a ballot measure that has become "specific legislation" and reflects a view on the measure is an attempt to influence legislation under section 4945(d)(1) and (e) unless it makes available the results of "nonpartisan analysis, study, or research" as defined in the regulations.

Petitioners argue that, except for the two radio messages that specifically refer to Measure 61 by name, the radio messages are not direct lobbying communications because they do not "refer to" the ballot measures—in that they do not mention any ballot measure by name. [42] Respondent argues that a communication can "refer to" a ballot measure without identifying it by name. We agree with respondent.

---

[42] Petitioners also argue that the radio messages "do not encourage the recipient to take action in any of the ways described in Treasury Regulation § 56.4911–2(d)(1)(ii)." However, the regulation petitioners cite makes no reference to any encouragement to take action. Petitioners are apparently referring to the regulations' definition of a grass roots lobbying communication, which requires that the communication encourage the recipient to take action with respect to the legislation at issue. *See* sec. 56.4911–2(b)(2)(ii)(C), Pub. Charity Excise Tax Regs. But respondent does not contend that the radio messages are grass roots lobbying communications; he contends that they are direct lobbying communications for which there is no requirement that the recipient be encouraged to take action.

The regulations do not provide a definition of the term "refers to" but instead elucidate its meaning through illustrative examples. *See* T.D. 8308, 1990–2 C.B. at 14. The pertinent examples address grass roots lobbying but are equally applicable in the case of direct lobbying.[43] Section 56.4911–2(b)(4)(ii)(B), *Example* (*1*), Pub. Charity Excise Tax Regs., explains:

A pamphlet distributed by organization Y states that the "President's plan for a drug-free America," which will establish a drug control program, should be passed. The pamphlet encourages readers to "write or call your senators and representatives and tell them to vote for the President's plan." No legislative proposal formally bears the name "President's plan for a drug-free America," but that and similar terms have been widely used in connection with specific legislation pending in Congress that was initially proposed by the President. Thus, the pamphlet refers to specific legislation, reflects a view on the legislation, and encourages readers to take action with respect to the legislation. The pamphlet is a grass roots lobbying communication.

By contrast, section 56.4911–2(b)(4)(ii)(A), *Example* (*4*), Pub. Charity Excise Tax Regs., explains:

A pamphlet distributed by organization Z discusses the dangers of drugs and encourages the public to send their legislators a coupon, printed with the statement "I support a drug-free America." The term "drug-free America" is not widely identified with any of the many specific pending legislative proposals regarding drug issues. The pamphlet does not refer to any of the numerous pending legislative proposals, nor does the organization support or oppose a specific legislative proposal. The pamphlet is not a grass roots lobbying communication.

Finally, section 56.4911–2(d)(1)(iii), *Example* (*1*), Pub. Charity Excise Tax Regs., explains:

A nonmembership organization includes in its newsletter an article about problems with the use of pesticide X that states in part: "Legislation that is pending in Congress would prohibit the use of this very dangerous pesticide. Fortunately, the legislation will probably be passed. Write your congressional representatives about this important issue." This is a grass roots lobbying communication that refers to and reflects a view on specific legislation and that encourages recipients to take action with respect to that legislation.

---

[43] Under the regulations, a required element of both a direct lobbying communication and a grass roots lobbying communication is that each "refers to specific legislation". Sec. 56.4911–2(b)(1)(ii)(A), (2)(ii)(A), Pub. Charity Excise Tax Regs.

On the basis of the principles illustrated in the regulatory examples, we hold that a communication "refers to" a ballot measure within the meaning of the regulations if it either refers to the measure by name or, without naming it, employs terms widely used in connection with the measure or describes the content or effect of the measure.

a. *1997*

The lone radio message Parks Foundation funded in 1997 refers to Oregon voters having told "the politicians" in 1994 that prisoners ought to be working 40 hours a week and then describes Oregon's Governor and attorney general as having disregarded the voters' intent by shutting down the prisoner work program. The message reiterates that Oregon voters had insisted that prison inmates should work, by virtue of the earlier vote.

In referring to prisoners working and the shutdown of prisoner work programs, the message employed terms "widely used in connection with" Measure 49. *Id.* para. (b)(4)(ii)(B), *Example (1)*. As the explanatory statement for Measure 49 makes clear, the reinstatement of prisoner work programs that had been shut down was the central purpose of the measure. On this record, we are persuaded that the use of various iterations of the term "prison inmate work program" in the explanatory statement for Measure 49 demonstrates that those and similar terms had been widely used in connection with Measure 49 at the time the radio message was broadcast. Petitioners have offered no evidence to support a contrary conclusion. In addition, we are persuaded that a comparison of the radio message and the explanatory statement demonstrates that the radio message described the general content of Measure 49. Consequently, the radio message "refers to" Measure 49 within the meaning of the regulations. Sec. 56.4911–2(b)(1)(ii)(A), Pub. Charity Excise Tax Regs. Moreover, considered in the context of the pendency of Measure 49—which according to the explanatory statement was designed to make reinstatement of prisoner work programs possible—the radio message's emphatic endorsement of the desirability of prisoner work programs means that the message also "reflects a view on" Measure 49 within the meaning of the regulations. *Id.* subdiv. (ii)(B). Accordingly, the 1997 radio message is a "direct lobbying communication"

under section 56.4911–2(b)(1), Pub. Charity Excise Tax Regs. unless it constitutes "nonpartisan analysis, study, or research" as defined in section 53.4945–2(d)(1)(ii), Foundation Excise Tax Regs., discussed *infra*.

b. *1998*

Measures 61 and 65 were on the ballot in Oregon's November 3, 1998, general election. Measure 61 would have enacted statutory provisions imposing minimum sentences for certain "major crimes" and mandatory additional sentences for certain repeat offenders. Measure 65 would have amended the Oregon Constitution to require Oregon Legislative Assembly approval of administrative rules adopted by State agencies when those rules are challenged in a petition signed by a specified number of qualified voters.

Foundation funded two radio messages that referred to Measure 61 by name and were broadcast in the month before the election. Each message "reflects a view on" Measure 61 because each posited that mandatory prison sentences for the crimes covered by Measure 61 would result in a reduction in crime in the same manner as had occurred after passage of an earlier measure (Measure 11) that established mandatory prison sentences for violent crimes. Accordingly, each of these radio messages "refers to" and "reflects a view on" Measure 61 within the meaning of the regulations. Each is thus a "direct lobbying communication" unless it constitutes "nonpartisan analysis, study, or research".

Foundation also paid for the production and broadcast of two additional radio messages in 1998, which also aired during the month before the November 3, 1998, general election, the subject of which was "administrative rules". Each message cites an example of a seemingly arbitrary and nonsensical government requirement imposed by "non-elected government bureaucrats" and equates it with "administrative rules" which—each message goes on to say—"you're gonna hear a lot more about * * * in the weeks to come." As noted, the radio messages were broadcast just weeks before the election where Measure 65 was on the ballot, and the explanatory statement for it referred extensively to administrative rules as the focus of the measure. On this record, we are persuaded that the use of the term "administrative rules" in the explanatory statement for Measure 65 demonstrates

that the term had been widely used in connection with Measure 65 at the time the radio messages were broadcast. Petitioners have offered no evidence to support a contrary conclusion. Consequently, we find that the term "administrative rules" was "widely used in connection with" Measure 65. Therefore each message "refers to" Measure 65 within the meaning of the regulations. Moreover, each message "reflects a view on" Measure 65 because each alleges an instance where an administrative rule was both unwarranted and contrary to legislative intent, strongly suggesting the desirability of the greater legislative oversight provided for in Measure 65. Therefore each radio message is a "direct lobbying communication" unless it constitutes "nonpartisan analysis, study, or research".

c. *1999*

Measures 69 through 75 were on the ballot in Oregon's November 2, 1999, statewide special election. The measures were placed on the ballot by action of the Oregon Legislative Assembly after a previously approved ballot measure— Measure 40, which proposed a panoply of changes to the Oregon Constitution affecting the criminal justice system, including constitutional rights for victims of crime—was found invalid by the Oregon Supreme Court because the ballot measure included multiple constitutional amendments. The Oregon Legislative Assembly responded by proposing the contents of Measure 40 as separate constitutional amendments, seven of which were denominated Measures 69 through 75, and referring them to the voters for reapproval.

On June 2, 1999, Foundation funded the production and broadcast of two radio messages. The messages were identical except in their reference to a specific member of the Oregon legislature. They described the passage of Measure 40, its invalidation by the Oregon Supreme Court, and the legislature's subsequent splitting of Measure 40 into separate ballot measures to be reapproved by the electorate. Because the foregoing describes the content and effect of Measures 69 through 75 (albeit without naming them), each radio message "refers to" Measures 69 through 75 within the meaning of the regulations. *See* sec. 56.4911–2(d)(1)(iii), *Example* (*1*), Pub. Charity Excise Tax Regs. Moreover, after describing the content and effect of Measures 69 through 75, each message

posed the rhetorical question "Who would be against this?" and suggested that only "The liberals and criminal defense lawyers" would be. Consequently, we conclude that each radio message "reflects a view on" Measures 69 through 75 within the meaning of the regulations. Thus, each is a "direct lobbying communication" unless it constitutes "nonpartisan analysis, study, or research".

d. *2000*

On the ballot for Oregon's general election on November 7, 2000, was Measure 8, which sought to amend the Oregon Constitution by limiting biennial State appropriations to no more than 15% of total personal income for the State in the two calendar years immediately preceding the budget period. During 2000, before the vote Foundation paid $341,062 for the production and broadcast of two radio messages.

The first message stated:

Is Oregon State government really growing nearly 3 times faster than the personal income of those who pay its bills?

Oregonians will soon be asked if they want to slow down the growth of their State government.

The message then provided data purporting to support the assertion that State government (as measured by its "income", or revenues) had grown nearly three times faster than personal income over the past decade.

The explanatory statement for Measure 8 described the measure as "linking the rate of growth of state government spending to the rate of growth of personal income in the state." Given the radio message's reference to the rate of growth of Oregon State government revenues as compared to the rate of growth of personal income, coupled with its reference to the fact that Oregonians would "soon be asked" whether they wanted to slow down the growth of their State government, we conclude that it "refers to" Measure 8 within the meaning of the regulations.[44] It both employs terms

--------

[44] We are mindful of that fact that the radio message equates State government growth with *revenue* growth, whereas Measure 8 would have limited State government growth by limiting *spending* growth. However, because Measure 8 directed that any revenue collected above its mandated spending limit be refunded to Oregon taxpayers, we are persuaded on this record that spending growth and revenue growth were treated inter-

"widely used in connection with"[45] Measure 8 and describes its effect.

The message's contention that State revenues had been growing at nearly three times the rate of growth of personal income over the past decade—a growth rate that any reasonable observer would likely think unsustainable—constitutes near-explicit support for the idea that the growth of State expenditures needed to be reigned in by some effective cap, as Measure 8 would have done. Consequently, we find that the message also "reflects a view on" Measure 8 within the meaning of the regulations. It is therefore a "direct lobbying communication" unless it constitutes "nonpartisan analysis, study, or research".

The second radio message also asserted, like the first, that Oregon State government had grown three times faster than personal income over the past 10 years. But it otherwise differs from the first radio message in three respects. First, the message asserts that the State government had filed a lawsuit against Foundation in retaliation for its broadcast of the disclosures about State government growth in the first radio message. Second, it cited several examples of the seemingly inappropriate expenditure of State funds for the health care of nonresidents and wealthy individuals and cited as another example the lawsuit, characterized as the State's use of taxpayer money "to intimidate us from revealing this kind of information." Finally, in contrast to the first radio message, the second did not state that Oregon voters "will soon be asked" whether they wanted to slow down the growth of their State government.

The absence of the "will soon be asked" language tips the balance against a finding that the second radio message is a "direct lobbying communication" within the meaning of the

---

changeably as equivalent indicators of government growth in discussions of Measure 8.

[45] Consistent with our analysis of the previous radio messages, we are persuaded that the explanatory statement's use of terms that linked the "rate of growth of state government" to the "rate of growth of personal income" demonstrates that those terms were widely used in connection with Measure 8 at the time the radio messages were broadcast. Petitioners have offered no evidence to support a contrary conclusion.

regulations. [46] While the second message, in comparing the rates of growth of State revenues and personal income, employs "terms widely used in connection with" Measure 8, the message is more accurately characterized as direct criticism of the Oregon State government without a suggestion of a remedy. The message's central thrust is no longer advocacy for Measure 8 but instead an attack on the Oregon State government as wasteful and as retaliatory with respect to its critics. Section 56.4911–2(b)(4)(ii)(B), *Example* (*1*), Pub. Charities Excise Tax Regs., describes a scenario where a pamphlet employs terms widely used in connection with a piece of legislation (without naming it) but the pamphlet also states that the legislation "should be passed". Against that benchmark, the second radio message falls short of "reflect[ing] a view on" Measure 8. It is therefore not a "direct lobbying communication".

## 2. *Nonpartisan Analysis, Study, or Research*

Foundation argues that even if the radio messages refer to and reflect a view on the various ballot measures, its expenditures for the messages were not "direct lobbying communications" or attempts to influence legislation under section 4945(d)(1) and the regulations because the radio messages qualify as "nonpartisan analysis, study, or research".

The exception for "nonpartisan analysis, study, or research" requires in the first instance that there have been *engagement* in nonpartisan analysis, study, or research that is made available to others. Sec. 53.4945–2(d)(1)(i), Foundation Excise Tax Regs. With the exception of the first radio message broadcast in 2000, [47] Foundation presented no evi-

---

[46] Respondent argues on brief that the second radio message's reference to the first effectively incorporates the "will soon be asked" language. We disagree.

[47] The first 2000 radio message satisfies one element of the regulatory requirements for the "nonpartisan analysis, study, or research" exception; namely, making available to the public the results of research. Sec. 53.4945–2(d)(1)(vii), *Example* (*4*), Foundation Excise Tax Regs., illustrating the requirements of the "nonpartisan analysis, study, or research" exception, makes clear that the analysis, study, or research being made available to the general public may be the private foundation's own work *or* research and the like collected from others and disseminated. The record establishes that some of the statistics reported in the first 2000 radio message were obtained from Oregon Tax Research.

dence that the information contained in any of the radio messages was the result of any study or research it conducted or collected from others, which gives rise to the presumption that Foundation did not conduct or collect any such study or research. *See Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947). Moreover, the parties have stipulated that the radio messages were all produced at an agency that "produces and arranges for the broadcast of political advertisements", suggesting a source that was not nonpartisan.

More fundamentally, "nonpartisan analysis, study, or research" must be an independent and objective exposition of a particular subject matter. For purposes of section 4945(e), "nonpartisan analysis, study, or research" means "an independent and objective exposition of a particular subject matter, including any activity that is 'educational' within the meaning of § 1.501(c)(3)–1(d)(3)." Sec. 53.4945–2(d)(1)(ii), Foundation Excise Tax Regs. While such an analysis may advocate a particular viewpoint, it must nonetheless present "a sufficiently full and fair exposition of the pertinent facts to enable the public or an individual to form an independent opinion or conclusion." *Id.*

As noted, the regulations provide that "nonpartisan analysis, study, or research" includes "any activity that is 'educational' within the meaning of § 1.501(c)(3)–1(d)(3)." Petitioners contend that the radio messages qualify both as "nonpartisan analysis, study, or research" and as "educational" as used in the statute and the regulations. The definitions of "educational" in section 1.501(c)(3)–1(d)(3), Income Tax Regs., and "nonpartisan analysis, study, or research" in section 53.4945–2(d)(1)(ii), Foundation Excise Tax Regs., both employ the same requirement that any communication which advocates a particular position or viewpoint must present a sufficiently "full and fair exposition" of the pertinent facts to enable the public or an individual to form an independent opinion or conclusion. [48]

---

[48] The requirement is stated in sec. 53.4945–2(d)(1)(ii), Foundation Excise Tax Regs., as allowing advocacy of "a particular position or viewpoint so long as there is a sufficiently full and fair exposition of the pertinent facts to enable the public or an individual to form an independent opinion or conclusion." The requirement is stated in sec. 1.501(c)(3)–1(d)(3), Income

Continued

The Commissioner has published the criteria he uses for determining whether the "full and fair exposition" requirement is satisfied such that advocacy will be treated as "educational" within the meaning of section 501(c)(3) and section 1.501(c)(3)–1(d)(3), Income Tax Regs., in Rev. Proc. 86–43, 1986–2 C.B. 729. [49] The criteria focus on the *method* an organization uses to communicate its viewpoint rather than the viewpoint itself. *See Nationalist Movement v. Commissioner*, 102 T.C. 558, 581–583 (1994), *aff'd on other grounds*, 37 F.3d 216 (5th Cir. 1994). A method is not considered educational "if it fails to provide a factual foundation for the viewpoint or position being advocated, or if it fails to provide a development from the relevant facts that would materially aid a listener or reader in a learning process." Rev. Proc. 86–43, sec. 3.02, 1986–2 C.B. at 729–730.

Rev. Proc. 86–43, sec. 3.03, 1986–2 C.B. at 730, provides that the presence of any of the following factors indicates an organization's method of presenting its viewpoint is not educational:

1 The presentation of viewpoints or positions unsupported by facts is a significant portion of the organization's communications.

2 The facts that purport to support the viewpoints or positions are distorted.

3 The organization's presentations make substantial use of inflammatory and disparaging terms and express conclusions more on the basis of strong emotional feelings than of objective evaluations.

4 The approach used in the organization's presentations is not aimed at developing an understanding on the part of the intended audience or

Tax Regs., as allowing advocacy of "a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion." The differences are solely stylistic.

[49] Rev. Proc. 86–43, 1986–2 C.B. 729, was issued in response to the decision of the Court of Appeals for the D.C. Circuit holding that the definition of "educational" in sec. 1.501(c)(3)–1(d)(3), Income Tax Regs., was unconstitutionally vague in articulating the substantive requirements of the "full and fair exposition" standard because it allowed "subjective application" by IRS officials. *See Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1037 (D.C. Cir. 1980). Petitioners have not challenged the sec. 1.501(c)(3)–1(d)(3), Income Tax Regs., definition of "educational" as unconstitutionally vague. They instead argue that the radio messages satisfy the criteria identified in Rev. Proc. 86–43, *supra*, and are therefore "educational".

readership because it does not consider their background or training in the subject matter.

Petitioners contend that the radio messages satisfy the criteria of Rev. Proc. 86–43, *supra*, and are therefore "educational"—making them "nonpartisan analysis, study, or research". We therefore must decide whether the radio messages we have found are "direct lobbying communications" are nonetheless "educational" and therefore "nonpartisan analysis, study, or research". In determining whether the radio messages contain factual distortions, we rely (except in the case of the radio messages broadcast in 2000) upon the explanatory statements for the relevant measures as a benchmark for impartial, objective analysis of the measures. Because the explanatory statements were, with one exception,[50] prepared pursuant to statutory requirements designed to ensure that they were impartial—most notably that the five-person drafting committee consist of two proponents, two opponents, and a fifth member agreed upon by the preceding four—we are satisfied that the explanatory statements provide a benchmark of impartiality against which the radio messages can be measured to assess whether they contain distortions. The financial impact statements published in the voters pamphlets are prepared under similar statutorily prescribed procedures designed to ensure their impartiality.

a. *1997*

The 1997 radio message contains multiple factors that under Rev. Proc. 86–43, *supra*, are indicative that the

---

[50] The one exception is the explanatory statement for Measure 49. In that instance, the Oregon legislature overrode the ordinarily applicable statutory provisions (Or. Rev. Stat. Ann. secs. 251.205 and 251.215 (West 2015) providing for the five-person drafting committee) and statutorily prescribed the wording of the explanatory statement. Nonetheless, we conclude that the explanatory statement for Measure 49 likewise provides a reasonable benchmark of impartiality in describing Measure 49. That is because, as discussed *infra*, the key distortion in the radio message referring to Measure 49 was the omission of the role played by the conflict between Federal law and the Oregon provisions for inmate work programs in causing the cessation of the Oregon inmate work programs. That conflict, pointed out in the explanatory statement, is an objective factor. Consequently, we do not believe the explanatory statement itself engaged in any distortion in pointing out the existence of the conflict.

method used to communicate the position is not educational. First, the message distorts the facts which led to Oregon's shutting down a number of its inmate work programs. *See* Rev. Proc. 86–43, sec. 3.03 (factor 2). The message suggests that Oregon's Governor and attorney general could have prevented the programs from being shut down but did not because of their personal views of the criminal justice system, i.e., they "just don't think criminals should spend much time in jail" and "think * * * [criminals] can be rehabilitated". However, the explanatory statement for Measure 49 indicates that the department of corrections shut the programs down because of a conflict with Federal law and explains further that the constitutional amendments proposed in Measure 49 were designed in part to make the constitutionally mandated inmate work programs comply with Federal law. The radio message's implication that Oregon's Governor and attorney general discontinued the inmate work programs because of their personal policy views ignores the role of the Federal law conflict in the shutdown and the fact that Measure 49 was proposed in part to cure that conflict. The radio message therefore distorts the facts.

Second, the message makes substantial use of inflammatory language and disparaging terms and reaches its conclusion on the basis of strong feelings rather than objective evaluations. *See id.* sec. 3.03(3). The message indicates that the Governor and the attorney general responded to the voters who approved the constitutional amendment creating inmate work programs by saying "NO, we're not gonna do it." Further, it characterizes the State's failure to have the programs fully operational as "a bunch of whiney excuses". These statements are inflammatory, disparaging, and taken as a whole appear calculated to induce an emotional response in suggesting (falsely) that certain elected officials disregarded an overwhelming popular vote in favor of their personal policy preferences. For the foregoing reasons, we conclude the message is not "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs.

b. *1998*

We likewise find that the two 1998 radio messages that refer to Measure 61 are not "educational". Each distorted facts in suggesting that a statute providing for certain

mandatory minimum sentences and certain additional sentences for repeat offenders could be implemented without significant cost. The first of the two messages contained the following statement concerning an earlier enactment (Measure 11) requiring minimum sentences:

> Back when John Kitzhaber was Senate President Legislation was passed that resulted in a convicted murderer, given a life sentence, actually serving less than 7 years in jail...

> They said they didn't have enough jail space.

> But then came Measure 11.

> It required mandatory sentences for violent criminals with no possibility of early release...and...it required the state to build enough jail space.

> They said it would cost billions of dollars. But it didn't.

> *    *    *    *    *    *    *

> And now Measure 61's on the ballot.

> It requires mandatory sentences for criminals convicted of property crimes.

> *    *    *    *    *    *    *

> If Measure 61 passes, that criminal goes to jail. And they'll have to build enough jail space to keep 'em... There'll be no early release.

The second radio message referencing Measure 61 stated in part:

> The citizens, not the politicians, passed Measure 11 putting violent criminals in jail.

> *    *    *    *    *    *    *

> They said it would cost billions. But, it didn't. And the crime rate went down.

> And now ... Measure 61.

> *    *    *    *    *    *    *

> With Measure 61, that criminal absolutely goes to jail ... and no early release.

In asserting that past claims about the financial impact of mandatory minimum prison sentences were unfounded, and thereby implying that cost is an inconsequential factor in deciding whether to enact further mandatory minimum sentences, both messages distorted the available facts concerning Measure 61. The financial impact statement for

Measure 61 estimated that the mandatory and presumptive sentences imposed by the measure would require 4,300 new prison beds by 2006, with additional direct State expenditures for prison construction and startup of $470 million by 2006. Direct State expenditures for prison operating costs and debt service were estimated at $21 million in the first two years after passage and $40 million in the following two years. By omitting and seeking to discredit these public estimates, the radio messages presented distortions of the facts in support of the position they advocated. *See* Rev. Proc. 86–43, sec. 3.03 (factor 2). They are thus not "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs.

The two radio messages broadcast in 1998 that refer to Measure 65 also exhibit factors identified in Rev. Proc. 86–43, *supra*, as indicative of a presentation method that is not "educational". Both messages make substantial use of disparaging terms. Both characterize the administrative agency personnel as "non-elected government bureaucrats". The first goes on to describe them as the legislature's "hired workforce" and characterizes their attitude towards landowners adversely affected by an administrative rule as "tough, that's your problem, not ours." The second characterizes administrators as having "made up" an administrative rule. *See id.* sec. 3.03 (factor 3). Both messages' description of the circumstances surrounding the administrative actions attacked are skeletal and incomplete. They do not identify or even meaningfully describe the statutes and administrative rules being criticized. One could surmise from the skeletal descriptions that both involved zoning disputes, but the messages do not provide even the most rudimentary description of the countervailing considerations raised by the particular land use requests that were apparently denied. Thus, the radio messages fail to provide "a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion." *Id.* sec. 2.01. Because neither message provides the listener with this basic information, the messages present "positions unsupported by facts", *id.* sec. 3.03 (factor 1), and are "not aimed at developing an understanding on the part of the intended audience * * * because * * * [they do] not consider * * * [the audience's] background or training in the subject

matter", *id.* (factor 4). These radio messages are thus not "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs.

c. *1999*

The two radio messages broadcast in 1999 that refer to Measures 69 through 75 are not "educational" because at least two of the criteria in Rev. Proc. 86–43, *supra*, are present. First, the messages offer no facts in support of the position that Measures 69 through 75 should be approved. Instead, each message summarily declares: "Who would be against this? The liberals and criminal defense lawyers." *See id.* sec. 3.03 (factor 1). Second, the messages express conclusions based more on strong feelings than on objective evaluations. The messages portray the two members of the Oregon legislature who opposed the referral of Measures 69 through 75 as "fighting against the victims of crime" in the victims' effort "to be treated at least as well as the criminals." *See id.* (factor 3). We conclude on the basis of the methods by which they presented their viewpoint that the messages were therefore not "educational".

d. *2000*

The first radio message broadcast in 2000 that refers to Measure 8 asserted that the size of State government (as measured by revenues) had increased nearly three times faster than personal income over the preceding 10 years. We have already concluded that the message's statement that Oregon voters "would soon be asked" if they wanted to slow down the growth of their State government was a reference to Measure 8, which would have limited State spending to 15% of personal income. A contemporaneous newspaper article concerning this radio message asserted that the radio message's statistics were flawed and misleading, insofar as they suggested that the Oregon State government was growing nearly three times faster than personal income. The article contended that the statistics had at least three shortcomings: (1) the use of personal income figures that were adjusted for population when the State spending figures were not; (2) the use of the growth rate of the State's general fund spending, rather than that of "all funds" spending, which rose 108% over the 10-year period as compared to 130% for

the general fund; and (3) a failure to account for the shift in spending on education from local governments to the State government resulting from a 1990 citizen-initiated measure that limited local property taxes. The article concluded by asserting that when adjustments were made to account for the foregoing flaws plus inflation, the rate of growth of State government (as measured by per capita State spending) was *less* than that of personal income; specifically, a 4% increase in State spending as compared to an 18% increase in personal income over the past decade.

Relying on the newspaper article, respondent contends that the radio message contains two of the factors in Rev. Proc. 86–43, *supra*, that indicate a communication is not educational. First, respondent argues, the message presents distorted facts, violating factor 2 of the revenue procedure. *See* Rev. Proc. 86–43, sec. 3.03 (factor 2).

Respondent's reliance on a newspaper article to demonstrate factual distortions in the 2000 radio messages stands in contrast to the benchmarks used for assessing factual distortions in the radio messages at issue in earlier years; namely, the explanatory statements. Those statements were the consensus product of a committee composed of persons favoring and opposing the ballot measure described. As previously discussed, we conclude that such a drafting process provided reasonable assurance of the explanatory statements' impartiality. By contrast, the newspaper article is itself a piece of advocacy—quite clearly making the case against the conclusions urged by the radio message. Respondent presents as evidence of the radio message's distorted facts the newspaper article's assertion that the radio message's comparison of the rate of growth of personal income with the rate of growth of State spending was "flawed" because the former is adjusted for population and the latter is not. On this record, we are unable to conclude that the radio message presented distorted facts. It has not been shown that the actual figures for the respective growths of personal income and State spending cited in the radio message were distorted. Instead, the claim of distortion is that the straightforward comparison of those two growth rates is "flawed" and, presumably, misleading because one is adjusted for population and the other is not. With better evidence to support it, respondent's contention might raise a

close question regarding where to draw the line between permissible advocacy and factual distortion. However, given the dubious evidence respondent has proffered—a newspaper article that is only in the record for lack of a hearsay objection, the author of which cannot be cross-examined—we are not persuaded that the radio message presented distorted facts.

Second, respondent contends, again relying on the newspaper article, that the radio message also violates factor 4 of Rev. Proc. 86–43, sec. 3.03 because "there is much background material that is missing from the presentation that would be necessary for the public to understand and evaluate the material." In this regard, respondent points to the newspaper article's assertion that the radio message's statistics failed to account for population growth, inflation, and the shift in school funding from local to State government. Respondent makes the further point in support of a factor 4 violation that "[t]he relationship between state spending and personal income is too complex to meaningfully be taught in a single minute as Foundation asserts it has done. Thus, the communication was not educational."

In *Nationalist Movement v. Commissioner*, 102 T.C. 558, we held that Rev. Proc. 86–43, *supra*, is not unconstitutionally vague on its face or as applied to the tax-exempt organization in that case. In so holding, we observed:

> Petitioner apparently reads the revenue procedure [Rev. Proc. 86–43, *supra*,] to require organizations to present and rebut opposing views * * * . * * * The revenue procedure, however, does not by its terms require this type of presentation * * * . Because the IRS does not condition educational status under the revenue procedure on the presentation of opposing views, the IRS is not called upon to evaluate how accurately or completely an organization presents such views. [*Id.* at 586–587.]

Factor 4 in Rev. Proc. 86–43, sec. 3.03 states that advocacy of a viewpoint may not be considered educational where "[t]he approach used in the organization's presentations is not aimed at developing an understanding on the part of the intended audience or readership because it does not consider their background or training in the subject matter." Respondent effectively argues that the radio message's omission of "background material"—which respondent identifies as the failure to adjust for population growth, inflation, or the shift in school funding from local to State government—

is a violation of factor 4. We disagree. We conclude instead that respondent's treatment of the omissions as a violation of factor 4 interprets Rev. Proc. 86–43, sec. 3.03 too expansively to require presentation of opposing views. For example, whether some portion of the sharp increase in State spending purportedly identified in the radio message could be accounted for by the shift in school funding responsibility to the State is a matter about which advocates for and against limitations on State spending could be expected to take opposing views.[51] But to require Foundation's advocacy for State spending limitations to disclose that argument lest it violate factor 4 goes too far. We specifically rejected that interpretation of Rev. Proc. 86–43, *supra*, in *Nationalist Movement* because it would require the IRS "to evaluate how accurately or completely an organization presents * * * [opposing] views." *Nationalist Movement v. Commissioner*, 102 T.C. at 587. We reject it here as well, and conclude that the first radio message in 2000 did not violate factor 4 of Rev. Proc. 86–43, sec. 3.03. Finally, for similar reasons, we reject respondent's contention that a factor 4 violation has occurred because the relationship between State spending and personal income is too complex to meaningfully be taught in a single minute. Accepting such an argument would disqualify most radio and television advertisements where the IRS deemed the subject matter "complex"—raising again the specter of subjective application that Rev. Proc. 86–43, *supra*, was intended to mitigate—or it would require the IRS to evaluate communications for accuracy and completeness in a manner proscribed by *Nationalist Movement*.

Because the first 2000 radio message provided facts and statistics to support its viewpoint that mandatory limits should be imposed on State spending, it has "provide[d] a factual foundation for the viewpoint or position being advocated", Rev. Proc. 86–43, sec. 3.02. The radio message did not violate factors 2 and 4 of Rev. Proc. 86–43, sec. 3.03 as con-

---

[51] We cite the school funding shift because the newspaper article does not explain how inflation should have been accounted for in its critique of Foundation's radio message or even whether one or both of the State revenue and personal income figures had been adjusted for inflation. We have considered the omission of the population growth adjustment in our discussion of whether the radio message presented distorted facts.

tended by respondent. Consequently, the radio message is "educational" and therefore "nonpartisan analysis, study, or research".

### 3. *Nonexempt Purpose*

Respondent argues in the alternative that the expenditures for the radio messages are taxable expenditures under section 4945(d)(5) because they were for a nonexempt purpose. Any amount paid by a private foundation "for any purpose other than one specified in section 170(c)(2)(B)" is a taxable expenditure. *Id.* The specified purposes are religious, charitable, scientific, literary, and educational, as well as fostering amateur sports competition and preventing cruelty to children or animals. Sec. 170(c)(2)(B). Thus, an expenditure for an activity which, if it were a substantial part of the organization's total activities, would cause loss of tax exemption is a taxable expenditure under section 4945(d)(5). Sec. 53.4945–6(a), Foundation Excise Tax Regs.; *see also* sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. Petitioners argue that the expenditures were not taxable expenditures under section 4945(d)(5) because they were "educational". Petitioners offer "educational" as the only exempt purpose of the expenditures.

We have already found, in considering petitioners' claim that the radio messages were "nonpartisan analysis, study, or research", that all but three of them were not "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs. They are therefore also taxable expenditures under section 4945(d)(5). We have concluded that the first 2000 radio message was "educational" within the meaning of section 501(c)(3) and section 1.501(c)(3)–1(d)(3), Income Tax Regs. Consequently, the expenditure for that radio message is not a taxable expenditure under section 4945(d)(5). That leaves two radio messages requiring further consideration: Communication #8 in 1999, which respondent has not contended is an attempt to influence legislation under section 4945(d)(1), and the second radio message in 2000, which we have concluded was not a "direct lobbying communication" though respondent so contended.

a. *Communication #8*

Communication #8 aired when several bills were before the Oregon Legislative Assembly in the spring and summer of 1999 that would have amended Measure 11, a citizen-initiated ballot measure passed in 1994 that established mandatory minimum sentences for certain crimes.

Communication #8 described a man recently arrested for "the gruesome serial murders of 3 women", documented his lengthy criminal history preceding that arrest, and noted the short prison sentence the man served for his past crimes. The message then contended that the man would still have been in jail had the mandatory minimum sentences of Measure 11 been in effect at the time and noted that the "State senate just voted to allow some violent Measure 11 convicts a 15% reduction in prison time." Asking rhetorically "Now, who would do that?", it identified four senators who had so voted.

Communication #8 contains two factors from Rev. Proc. 86–43, *supra*, indicating that it is not "educational". First, in failing to provide information concerning the circumstances under which the sentence reductions would apply, the radio message omits critical facts. *See id.* sec. 3.02 and 3.03(1). Without these facts, a listener could not evaluate whether the reductions were justified or whether they would have reduced the sentence of the accused serial murderer (had he been sentenced for his earlier convictions when Measure 11 was applicable). Second, in highlighting "gruesome serial murders" and the extensive criminal background of a single individual, without disclosing the nature of the reductions in the legislation supported by the named senators, the presentation expresses a conclusion—namely, that the four named senators acted reprehensibly—"more on the basis of strong emotional feelings than of objective evaluations." *Id.* sec. 3.03(3). Communication #8 is therefore not "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs., and Foundation's expenditure for it is a taxable expenditure under section 4549(d)(5).

b. *Second Radio Message in 2000*

The second 2000 radio message repeated the claim of the first that State government revenue had grown nearly three

times faster than personal income but also made a new and different assertion; namely, that the State of Oregon had filed a lawsuit against Foundation in retaliation for its disclosures in the first 2000 radio message about the growth rate of State revenue. In making the assertion about retaliation, the radio message did not disclose that Foundation had been under audit by the Oregon attorney general's office concerning its expenditures for radio advertisements for (at a minimum) more than two years before the first 2000 radio message was broadcast—a material fact of substantial relevance to the claim of retaliation. Petitioners have offered no additional evidence to support the radio message's claim about retaliation, and the evidence in the record—concerning the length and seriousness of the attorney general's investigation and the unlikely prospects of settlement—tends to rebut the claim of retaliation. We conclude that the failure to disclose the investigation, given the material nature of that fact to the claim of retaliation, rendered the radio message's assertion concerning the retaliatory nature of the lawsuit a factual distortion. *See* Rev. Proc. 86–43, sec. 3.03 (factor 2). Moreover, the radio message went on to characterize the State's filing of the lawsuit as follows: "Isn't that what Richard Nixon did when he used the IRS to go after his political enemies?" These are obviously inflammatory and disparaging terms, causing the radio message to violate factor 3 of Rev. Proc. 86–43, sec. 3.03 as well. Given the presence of factors 2 and 3, we conclude that the second 2000 radio message's presentation is not "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs., and Foundation's expenditure for it is a taxable expenditure under section 4549(d)(5).

### 4. *Conclusion*

Foundation's expenditures for all of the radio messages during its years at issue, except Communication #8 and the first and second 2000 radio messages, were taxable expenditures under section 4945(d)(1) because they were attempts to influence legislation as defined in section 4945(e) and the regulations thereunder. In addition, all of the expenditures, except the first 2000 radio message, were taxable expenditures under section 4945(d)(5) because they were not for an exempt purpose specified in section 170(c)(2)(B). The first

2000 radio message was "educational" within the meaning of section 1.501(c)(3)–1(d)(3), Income Tax Regs., as applied in Rev. Proc. 86–43, *supra*. Consequently, the amounts Foundation paid[52] for the first 2000 radio message are not a taxable expenditure under either section 4945(d)(1) or (5), as determined by respondent. Except with respect to the expenditure for the first 2000 radio message, we sustain respondent's determination of the section 4945(a)(1) excise tax deficiencies for Foundation for its years at issue.

B. *Section 4945(a)(2)*

Respondent determined excise tax deficiencies under section 4945(a)(2) for Mr. Parks of $1,625, $5,000, $825, and $5,000 for 1997, 1998, 1999, and 2000, respectively. Section 4945(a)(2) imposes a 2.5% tax on "the agreement of any foundation manager to the making of an expenditure, knowing that it is a taxable expenditure, * * * unless such agreement is not willful and is due to reasonable cause." The tax is limited to $5,000 per taxable expenditure and payable by the foundation manager.[53] Sec. 4945(a)(2), (c)(2). The parties stipulated that to the extent Foundation is found liable for tax under section 4945(a)(1), "Mr. Parks shall be deemed liable pursuant to I.R.C. § 4549(a)(2), subject to the $5,000 limitation contained in I.R.C. § 4945(c)(2), unless Mr. Parks establishes that he agreed to the expenditures based on advice of counsel as described in Treas. Reg. § 53.4945–1(a)(2)(vi)."[54]

---

[52] As noted, respondent represents on brief that Foundation's records did not establish what portion of the $341,062 Foundation spent during its 2000 taxable year was allocable to the first and second radio messages, respectively. Such an allocation now becomes necessary in view of our holding that the expenditure for the first was not a taxable expenditure while the expenditure for the second was. We expect the parties to resolve this issue as part of their computations under Rule 155. We note in this regard that Foundation bears the burden of establishing that an expenditure is not a taxable expenditure.

[53] The limit increased to $10,000 per taxable expenditure for taxable years beginning after August 17, 2006. PPA sec. 1212(e)(2)(A), (f), 120 Stat. at 1075.

[54] We find implicit in this stipulation the proposition that Mr. Parks was a "foundation manager" within the meaning of sec. 4946(b). The parties also stipulated that Mr. Parks was a member of the board of directors of Foundation and that he approved all of the taxable expenditures at issue.

We note as a preliminary matter that section 53.4945–1(a)(2)(vi), Foundation Excise Tax Regs., provides that "the absence of advice of counsel with respect to an expenditure shall not, by itself, give rise to any inference that a foundation manager agreed to the making of the expenditure knowingly, willfully, or without reasonable cause." The parties' stipulation, however, has narrowed Mr. Parks' defense to one of reliance on advice of counsel; pursuant to the stipulation, Mr. Parks will incur the section 4945(a)(2) excise taxes (to the extent Foundation is found liable for the related section 4945(a)(1) taxes) unless he affirmatively establishes that he agreed to the making of the expenditures "based on the advice of counsel" as that advice is described in the regulation.

Section 53.4945–1(a)(2)(vi), Foundation Excise Tax Regs., provides in part as follows:

> (vi) Advice of counsel.—If a foundation manager, after full disclosure of the factual situation to legal counsel * * * , relies on the advice of such counsel expressed in a reasoned written legal opinion that an expenditure is not a taxable expenditure under section 4945 (or that expenditures conforming to certain guidelines are not taxable expenditures), although such expenditure is subsequently held to be a taxable expenditure * * * , the foundation manager's agreement to such expenditure * * * will ordinarily not be considered "knowing" or "willful" and will ordinarily be considered "due to reasonable cause" within the meaning of section 4945(a)(2). * * *

A written legal opinion will be considered "reasoned" even if it reaches a conclusion that is subsequently determined to be incorrect so long as it "addresses itself to the facts and applicable law." *Id.* A written legal opinion that "does nothing more than recite the facts and express a conclusion" is not "reasoned". *Id.*

The parties stipulated that drafts of the radio messages created after November 30, 1997, were provided to Foundation's tax counsel for his review and approval. However, the record contains only two written responses from the attorney that address whether specific radio messages would give rise to a taxable expenditure, and a letter from him that could be construed as providing guidelines for taxable expenditures.

The first written response that opined that a specific radio message would not give rise to a taxable expenditure concerned the first 1998 radio message that referred to Measure

61. The response is reproduced in full in our findings. As pertinent here, the response states:

> We have reviewed the text of radio spot M61#1. The Foundation is not permitted to support or oppose any political candidate or any ballot measures. * * * The conclusion of this radio spot is close to an endorsement of the ballot measure, but we do not think it goes too far. * * *

Thus, the conclusion effectively reached is that the radio message did not "reflect[ ] a view on" Measure 61 as provided in the regulations. *See* sec. 56.4911–2(b)(1), Pub. Charity Excise Tax Regs. However, nowhere does the written response address the facts of the radio message or the substance of the applicable law, such as describing how the statements in the message are similar to, or distinguishable from, the regulatory examples that delineate what constitutes "reflect[ing] a view on" a ballot measure for purposes of defining a "direct lobbying communication". Consequently, this written response provided by Foundation's tax counsel does not qualify as a "reasoned written legal opinion" under the regulations. [55]

The second written response that opined that a specific radio message would not give rise to a taxable expenditure concerned the two 1998 radio messages that we have concluded referred to Measure 65. That written response stated in full: "We have reviewed the texts of spots labeled M65–1 and M65–2. They appear to comply with the 'public education' purpose of the Parks Foundation. If you have further questions, please contact us." This statement "does nothing more than recite the facts and express a conclusion", sec. 53.4945–1(a)(2)(vi), Foundation Excise Tax Regs., and is therefore not a "reasoned written legal opinion" under the regulations.

Finally, an October 14, 1999, letter from Foundation's tax counsel to Mr. Parks advised him of the exception for lobbying communications that express a point of view so long as the message is "educational". As pertinent to the "edu-

---

[55] Even if one were to construe the written response's conclusion that the radio message "does not go too far" as premised on the proposition that the message constituted "nonpartisan research, analysis, or study" or was "educational" within the meaning of the regulations, there is likewise no discussion of the requirements of those regulatory exceptions or how the message met those requirements.

cational" exception for lobbying communications, the letter stated:

> It is not possible to express a "general rule" for you to follow in your political efforts. Instead, we urge you to simply stay focused on the facts. Do not succumb to emotion or generalizations of "good" or "bad" or "conservative" or "liberal." It is certainly acceptable to use humor, sarcasm and imagery as long as they do not obscure the factual basis of your message.

To the extent this October 14, 1999, letter may constitute guidelines as contemplated in the regulations, it could provide a basis for relief only with respect to the expenditures for the two radio messages prepared and broadcast in 2000.[56] The expenditures for the 1999 radio messages were made in June and July of 1999; thus Mr. Parks could not have relied on this letter in making those expenditures or any earlier ones.

Respondent contends that the letter does not constitute advisory guidelines for purposes of the regulation because it does not cite specified language from the regulations and Rev. Proc. 86–43, *supra*, and therefore does not "address itself to the * * * applicable law" concerning what is "educational". We disagree. The letter explains, as respondent concedes on brief, that an expenditure for a lobbying communication that qualifies as "educational" is not a taxable expenditure. The letter further points out that even where the communication expresses a point of view, it is not lobbying if it "stay[s] focused on the facts" and avoids emotion and conclusory generalizations. The foregoing material reasonably approximates the substance of the definition of "educational" in section 53.4945–2(d)(1)(ii), Foundation Excise Tax Regs., as delineated in Rev. Proc. 86–43, *supra*. We note in this regard the letter's reference to a "point of view" being allowable and the emphasis on sticking to facts, which approximate the regulation.[57] In addition, the letter's

---

[56] Since we have concluded that Foundation's expenditure for the first 2000 radio message was not a taxable expenditure, we need not decide whether Mr. Parks had reasonable cause based on advice of counsel in agreeing to the expenditure.

[57] As noted, sec. 53.4945–2(d)(1)(ii), Foundation Excise Tax Regs., provides that a communication is "educational" even though it "advocate[s] a particular position or viewpoint so long as there is a sufficiently full and

Continued

instructions to avoid emotion and generalizations reflect factors identified in Rev. Proc. 86–43, *supra*, to be avoided; namely, "express[ing] conclusions more on the basis of strong emotional feelings than of objective evidence" and "viewpoints * * * unsupported by facts". While the letter's analysis is far from a perfect distillation of the applicable law defining an "educational" communication, we conclude that it discussed the applicable law with sufficient accuracy to qualify as a "reasoned written legal opinion" under section 53.4945–1(a)(2)(vi), Foundation Excise Tax Regs.

The question remains whether Mr. Parks in fact relied on Foundation's tax counsel's advice; that is, whether the second radio message he approved in 2000 adhered to the letter's guidelines so that Mr. Parks' reliance could be said to have been based on that adherence.

As previously noted, the second 2000 radio message repeated the claim of the first about the growth rate of the Oregon State government but made the additional claim that the State government had filed a lawsuit against Foundation in retaliation for the disclosures about the growth rate that Foundation made in the first radio message. Mr. Parks necessarily knew when he agreed to the expenditure for the second message that the assertion about the lawsuit's having been filed as retaliation was a factual distortion. At that time, he knew—by virtue of the October 14, 1999, letter to him from Foundation's tax counsel—that Foundation's funding of radio advertisements had been under active investigation by State authorities and was unlikely to be resolved by settlement, well before the broadcast of the first radio message in 2000. Thus Mr. Parks knew that the second message did not adhere to the letter's guideline to "stay focused on the facts"; he knew that the second message contained a significant distortion of fact. Consequently, he did not agree to the expenditure in reliance on legal counsel's advice that conforming the expenditure to stated guidelines would prevent it from being held to be a taxable expenditure. As a result, Mr. Parks has not established that his agreement to the expenditure for the second radio message in 2000 was based on advice of counsel as described in section 53.4549–1(a)(2)(vi), Foundation Excise Tax Regs.

fair exposition of the pertinent facts".

Mr. Parks has offered no evidence of any other written legal opinion addressing the radio messages at issue. Therefore, he has failed to establish, as stated in the parties' stipulations, that he agreed to the taxable expenditures on advice of counsel as described in section 53.4945–1(a)(2)(vi), Foundation Excise Tax Regs. Accordingly, we sustain respondent's determination that Mr. Parks has deficiencies in excise tax under section 4945(a)(2) for his years at issue, except with respect to Foundation's expenditure for the first 2000 radio message.

### C. *Section 4945(b)(1)*

Respondent also determined excise tax deficiencies under section 4945(b)(1) for Foundation of $65,000, $200,000, $33,012, and $341,062 for its 1997, 1998, 1999, and 2000 taxable years, respectively. Section 4945(b)(1) imposes a tax equal to 100% of the amount of a taxable expenditure, payable by the private foundation, when tax is imposed under section 4945(a)(1) and the taxable expenditure is "not corrected within the taxable period". The "taxable period" begins on the date the taxable expenditure is made and ends on the earlier of: (1) the date a notice of deficiency with respect to the tax imposed by section 4945(a)(1) is mailed; or (2) the date on which such tax is assessed. Sec. 4945(i)(2).

"Correction" of a taxable expenditure occurs when all or part of the expenditure is recovered and, if full recovery is not possible, corrective action prescribed by the Secretary is taken. Sec. 4945(i)(1).

The "taxable period" for Foundation ended on December 22, 2006, when respondent mailed a notice of deficiency to it determining deficiencies under section 4945(a)(1). The taxable expenditures were not corrected within the taxable period.

Petitioners contend that they should not be held liable for the second tier excise taxes (both Foundation's under section 4549(b)(1) and Mr. Parks' under section 4549(b)(2), discussed below) because they could still correct the taxable expenditures under the "correction period" provided under sections 4961(a) and 4963(e). While it is true that petitioners may still avoid liability for the second tier excise taxes by correcting the taxable expenditures during the "correction period" provided in section 4963(e)—which in general extends

through any period during which the excise tax deficiencies cannot be assessed under section 6213(a)—sections 4961(a) and 4963(e) do not impair our jurisdiction to redetermine the deficiencies as determined by respondent. Indeed, the scheme of those sections is designed to enable Tax Court jurisdiction to review section 4549(b) excise tax deficiency determinations. *See Thorne v. Commissioner*, 99 T.C. at 95–96; H.R. Rept. No. 96–912, at 1–3 (1980), 1980–2 C.B. 657, 657–658.

Because Foundation's taxable expenditures were not corrected within the "taxable period" provided in section 4945(i)(2), we sustain respondent's determination of deficiencies under section 4945(b)(1) for its taxable years at issue, except with respect to the failure to correct the expenditure for the first 2000 radio message, which was not a taxable expenditure.

D. *Section 4945(b)(2)*

Respondent determined excise tax deficiencies under section 4945(b)(2) for Mr. Parks of $10,000 each year for 1997, 1998, 1999, and 2000. When tax is imposed by section 4945(b)(1), section 4945(b)(2) imposes a tax equal to 50% of the amount of the taxable expenditure on any foundation manager who "refused to agree to part or all of the correction". The tax is limited, however, to $10,000 per expenditure. Sec. 4945(c)(2).[58] The Commissioner must formally request correction in order for the tax to be imposed. *Thorne v. Commissioner*, 99 T.C. at 97.

Respondent's revenue agent made a formal request that Mr. Parks correct the taxable expenditures at issue in a letter sent to Foundation's tax counsel on October 16, 2002. Foundation's tax counsel replied with a letter on November 11, 2002, informing the revenue agent that Mr. Parks refused to make the requested correction. Accordingly, we sustain respondent's deficiency determinations under section 4945(b)(2) for Mr. Parks for his years at issue, except with respect to the failure to correct the expenditure for the first 2000 radio message, which was not a taxable expenditure.

---

[58] The limit increased to $20,000 per taxable expenditure for taxable years beginning after August 17, 2006. *See* PPA sec. 1212(e)(2)(B), (f), 120 Stat. at 1075.

III. *Petitioners' Constitutional Challenges*

Because we find petitioners are liable for excise taxes pursuant to section 4945, we must address petitioners' claim that imposition of the excise taxes at issue is unconstitutional. Petitioners argue that section 4945 and the regulations thereunder, as applied to Foundation's expenditures for the radio messages, impermissibly burden their First Amendment right to freedom of speech. Petitioners also argue that the regulatory provisions that define a direct lobbying communication are unconstitutionally vague. We will address these arguments in turn.

A. *First Amendment*

Petitioners, relying on the U.S. Supreme Court's decision in *Fed. Election Comm'n v. Wis. Right to Life* (*WRTL*), 551 U.S. 449 (2007), contend that to the extent the radio messages may be found to constitute lobbying, they are "political speech", and governmental restrictions on the political speech of nonprofit corporations are subject to strict scrutiny. Under that well-recognized standard of review, the government must show that application of the governmental restriction "furthers a compelling interest and is narrowly tailored to achieve that interest". *Id.* at 464. Petitioners suggest that the Supreme Court's decision in *Citizens United v. Fed. Election Comm'n* (*Citizens United*), 558 U.S. 310 (2010), also subjecting to strict scrutiny a Federal election law prohibition on a corporation's use of general treasury funds to make independent expenditures for electioneering communications, reinforces that exacting standard for any restrictions on the political speech of nonprofit corporations.[59] Respondent, petitioners argue, has failed to make the required showing with respect to the excise taxes imposed on account of Foundation's expenditures for the radio messages.

Petitioners also argue that the implementing regulations fail to pass muster under *WRTL* because they depend upon a "contextual analysis" in determining whether an expendi-

[59] In *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010), the Supreme Court held that the First Amendment prohibits restrictions on political speech based on the speaker's identity as a corporation, observing: "No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations."

ture is a "direct lobbying communication", an approach which *WRTL* proscribes. While petitioners' articulation of this latter argument is sketchy, they presumably are contending that the regulations' use of context [60] to conclude that a communication refers to a specific ballot measure, even when the communication does not name the measure, is impermissible under *WRTL*. The Supreme Court in *WRTL* held that the standard for a restriction on political speech "must be objective, focusing on the substance of the communication rather than amorphous considerations of intent and effect", 551 U.S. at 469, and that "contextual factors * * * should seldom play a significant role in the inquiry", *id.* at 473–474.

Petitioners' arguments are misplaced. *WRTL* and *Citizens United* involved outright bans on expenditures for certain political speech of nonprofit (and for-profit) corporations under Federal election law. In each case the Supreme Court concluded that strict scrutiny applied. *See Citizens United*, 558 U.S. at 340; *WRTL*, 551 U.S. at 464. At issue here is Congress' imposition of a tax on an otherwise tax-exempt private foundation as a sanction to deter its use of tax-deductible contributions for lobbying expenditures. The applicable Supreme Court precedent concerning whether the First Amendment prohibits restrictions on lobbying by tax-exempt organizations eligible to receive tax-deductible contributions is *Regan v. Taxation With Representation of Wash.* (*Regan*), 461 U.S. 540 (1983). In that case, the Commissioner had denied section 501(c)(3) tax-exempt status to Taxation With Representation of Washington (TWR), a nonprofit corporation, because it intended to engage in substantial lobbying activities (i.e., a greater amount than permitted under the standard in section 501(c)(3) limiting tax exemption to corporations "no substantial part of the activities of which is * * * attempting * * * to influence legislation"). TWR argued that Congress' denial of tax-exempt status on the basis of the corporation's engagement in greater-than-insubstantial lobbying activities violated the First Amendment.

---

[60] As illustrations of this use of context, we have found that the examples in the regulations demonstrate that a communication "refers to" a ballot measure, notwithstanding a failure to cite it by name, when it employs terms widely used in connection with the measure or describes its general content or effect.

The Supreme Court disagreed, reasoning that "[b]oth tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system" and that Congress may, consistent with the First Amendment, choose not to subsidize lobbying by prohibiting the expenditure of tax-deductible contributions for it. *Regan*, 461 U.S. at 544–545. The Court rejected TWR's claim that the prohibition against substantial lobbying by section 501(c)(3) organizations imposed an "unconstitutional condition" on the receipt of tax-deductible contributions—as proscribed by *Speiser v. Randall*, 357 U.S. 513 (1958). Instead, the Court reasoned, since TWR could employ (as it had in the past) a dual structure of a section 501(c)(4) tax-exempt entity to conduct its lobbying activities (without using deductible contributions for that purpose) and a section 501(c)(3) tax-exempt entity receiving deductible contributions to conduct nonlobbying charitable activities, the Internal Revenue Code did not deny TWR the right to receive deductible contributions to support its nonlobbying activities, nor deny it any independent benefit on account of its intention to lobby; Congress was merely refusing to pay for the lobbying out of public moneys. *Regan*, 461 U.S. at 545.[61] Rejecting TWR's First Amendment claim outright, the Court reaffirmed its earlier holding in *Cammarano v. United States*, 358 U.S. 498 (1959), that

> Congress is not required by the First Amendment to subsidize lobbying. In these cases, as in *Cammarano*, Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for TWR's lobbying. We again reject the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." [*Regan*, 461 U.S. at 546; citations omitted.]

The Court also rejected the proposition that Congress' decision to deny a subsidy for lobbying by section 501(c)(3) organizations is subject to the strict scrutiny standard of review. "We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict

---

[61] This aspect of the Supreme Court's reasoning in *Regan* concerning a sec. 501(c)(3) organization's ability to use an affiliated sec. 501(c)(4) entity for the conduct of lobbying has become known as the "alternate channel doctrine". *See* Miriam Galston, "Campaign Speech and Contextual Analysis", 6 First Amend. L. Rev. 100 (2007).

scrutiny." *Id.* at 549. A higher level of scrutiny is appropriate only if a subsidy-allocating statute "employ[s] a suspect classification, such as race", *id.* at 547, or "discriminate[s] invidiously in its subsidies in such a way as to '[aim] at the suppression of dangerous ideas'", *id.* at 548 (quoting *Cammarano*, 358 U.S. at 513). Absent the foregoing, the government need only show a rational basis for the decision not to extend a subsidy for speech by allowing tax-deductible contributions to support it. *Id.* at 546–551; *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) (reaffirming *Regan* holding in finding strict scrutiny inapplicable in assessing First Amendment restrictions on State's prohibition on local government's withholding of union dues from wages to support political activities); *Am. Soc'y of Ass'n Execs. v. United States*, 195 F.3d 47 (D.C. Cir. 1999) (finding strict scrutiny review inapplicable in assessing First Amendment restrictions on denial of Federal income tax deduction for portion of dues paid to tax-exempt trade association engaged in lobbying, citing *Regan*).

It follows that if Congress may, consistent with the First Amendment, deny outright the tax exemption and eligibility to receive tax-deductible contributions for a section 501(c)(3) organization that engages in substantial lobbying—in order to deprive the organization of any tax subsidy for lobbying—it may also impose on the subset of section 501(c)(3) organizations classified as private foundations the less onerous sanction of excise taxes that are proportionate to the lobbying expenditures and likewise designed to deter the use of any tax subsidy for lobbying. Furthermore, because legislative acts of this nature are treated as the denial of a subsidy for speech, subject to rational basis rather than strict scrutiny review, it is clear that Congress or a State government can employ a range of methods to reduce or eliminate a governmental subsidy for speech, such as outright denial of tax exemption and eligibility to receive tax-deductible contributions (*Regan*), a proxy tax to recapture the benefit of tax-deductible contributions (*Am. Soc'y of Ass'n Execs.*), or a State prohibition on local governments' withholding from wages any union dues to support political activities (*Pocatello Educ. Ass'n*). The excise taxes at issue are in this respect quite similar to the proxy tax upheld in *Am. Soc'y of Ass'n*

*Execs.*: Both taxes serve to recapture some of the benefit of the tax-deductible source of the funds.

Thus, the excise taxes at issue readily pass rational basis scrutiny. [62] As previously noted, Congress chose to impose excise taxes on private foundations because it concluded that such taxes would be a more effective and proportionate sanction (as compared to revocation of tax-exempt status) for discouraging private foundation expenditures of tax-exempt and tax-deductible funds for lobbying or other nonexempt purposes. *See* S. Rept. No. 91–552, *supra* at 48, 1969–3 C.B. at 455; H.R. Rept. No. 91–413, *supra* at 31–36, 1969–3 C.B. at 221–223. Thus, the excise taxes at issue were intended as a more effective means of limiting the use of the subsidy. As in *Regan*, the excise taxes thus bear "a rational relation to a legitimate governmental purpose" of limiting the tax subsidization of lobbying. *Regan*, 461 U.S. at 547. [63]

Moreover, as with the taxpayer in *Regan*, Mr. Parks could readily avoid the excise taxes for himself and the Foundation by establishing a separate section 501(c)(4) tax-exempt entity to make lobbying expenditures, albeit without using tax-deductible contributions to fund those expenditures. *See id.* at 544, 552–553. Thus, consistent with the alternate channel doctrine espoused in *Regan*, because Foundation could undertake lobbying through an affiliated section 501(c)(4) organization without incurring these excise taxes, the taxes do not

---

[62] We note petitioners do not contend that sec. 4945 and the implementing regulations employ any suspect classifications or seek to suppress any particular idea or ideology such that heightened scrutiny would be triggered on that basis. *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 547–548 (1983). Indeed, the excise taxes are triggered when a communication refers to "specific legislation" and "reflects a view on such legislation", sec. 56.4911–2(b)(1), Pub. Charity Excise Tax Regs., without regard to the content of either.

[63] Indeed, in *Regan* the Supreme Court expressly endorsed as legitimate and rational the denial of tax-exempt status as a means of preventing the subsidization of lobbying that served a private interest.

It appears that Congress was concerned that exempt organizations might use tax-deductible contributions to lobby to promote the private interests of their members. It is not irrational for Congress to decide that tax exempt charities such as TWR should not further benefit at the expense of taxpayers at large by obtaining a further subsidy for lobbying. [*Regan*, 461 U.S. at 550; citations omitted.]

The excise taxes at issue are a less onerous means towards the same end.

burden lobbying, but instead only operate to limit its subsidization. In sum, *Regan* and its progeny make clear that the First Amendment does not prohibit the imposition of the excise taxes at issue in these cases.

Apparently recognizing the difficulties presented by *Regan* for their constitutional claims, petitioners contend that the Supreme Court decision in *WRTL*, which reflects a greater degree of First Amendment protection for the political speech of nonprofit corporations, has superseded *Regan*. [64] Consequently, petitioners argue, the excise taxes at issue can no longer pass muster under the heightened First Amendment protection for corporate speech reflected in the more recent Supreme Court jurisprudence.

There are significant distinctions between *Regan* and these two more recent Supreme Court decisions. Both *WRTL* and *Citizens United* involved Federal election law and outright bans on speech, backed by criminal sanctions. *See Citizens United*, 558 U.S. at 337; *WRTL*, 551 U.S. at 457. The excise taxes at issue here are, in accordance with the *Regan* analysis, designed to discourage the use of a tax subsidy and, where the subsidy has been used in a manner not intended by Congress, they have the effect of recapturing a portion of it. In this regard, we also note that the more onerous second tier excise taxes can be avoided by correction, even after judicial review that sustains their imposition. Such limitations on a tax subsidy would not trigger strict scrutiny under *Regan*. Neither *WRTL* nor *Citizens United* discussed or even cited *Regan*, which at least suggests that its principle that the denial of a tax subsidy for speech does not abridge First Amendment rights is unaffected by those cases. Moreover, two years after the *WRTL* decision, the Supreme Court relied heavily on *Regan* in holding that a State's ban on payroll deductions to support a public employee union's political activities did not abridge the union's First Amendment rights because the State was merely declining to subsidize such rights. *Pocatello Educ. Ass'n*, 555 U.S. at 358–359. *Pocatello Educ. Ass'n* would suggest, contrary to petitioners' contentions, that *Regan* retains full vitality after *WRTL*.

---

[64] Petitioners also cite *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2000), as reflecting the heightened First Amendment protections accorded to the political speech of incorporated entities.

On the other hand, both *WRTL* and *Citizens United* undoubtedly result in a more enhanced level of First Amendment protection for the political speech of incorporated entities than had existed before those decisions. In particular, the identity of the speaker as a corporate entity was justification for certain restrictions on political speech under *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652 (1990), a decision overruled in *Citizens United*, 558 U.S. at 365. In so doing, the Supreme Court reasoned in quite broad terms: "[T]he government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient government interest justifies limits on the political speech of nonprofit or for-profit corporations." *Id. Citizens United*, 558 U.S. at 337–339, also casts some doubt on the alternate channel doctrine by rejecting the argument that a corporation's ability to establish a political action committee for engaging in electioneering communications alleviated the First Amendment problem with restrictions on the corporation's entitlement to make these communications directly.

In any event, even if one believed that *WRTL* or *Citizens United* casts some doubt on the reasoning in *Regan*, the Supreme Court has made clear that it is not the province of a lower Federal court to overrule a Supreme Court precedent that applies to the case before it. "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). The issue in these cases concerns the constitutionality of Congress' imposition of an excise tax to limit the use of tax-deductible funds for lobbying by a tax-exempt entity. Because *Regan* resolved the same question where Congress used denial of tax-exempt status to the same end, that case directly controls and we must follow it, notwithstanding any suggestion that some of its reasoning may have been undermined in later Supreme Court decisions in another area—the constitutionality of Federal election law restrictions on the political speech of corporate entities.

B. *Vagueness*

Petitioners also argue that the regulations defining a direct lobbying communication as one that "refers to" specific legislation, *see* sec. 56.4911–2(b)(1)(ii)(A), Pub. Charity Excise Tax Regs., are unconstitutionally vague because they fail to give notice of the conduct proscribed and enable discriminatory enforcement. Petitioners contend that the regulations' use of illustrative examples to elucidate the meaning of "refers to", *see, e.g.*, sec. 56.4911–2(b)(4)(ii)(A) and (B), (d)(1)(iii), Pub. Charity Excise Tax Regs., fails to give the required notice of proscribed conduct. Petitioners further contend that the regulatory examples' extension of the meaning of "refers to" beyond communications that make specific reference by name to legislation constitutes the use of a multifactor test for distinguishing permissible from impermissible speech that was proscribed in *WRTL*, 551 U.S. at 469 (the standard for distinguishing permissible from impermissible speech "must eschew 'the open-ended rough-and-tumble of factors,' which 'invit[es] complex argument in a trial court and a virtually inevitable appeal." (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995))).

The vagueness doctrine is grounded in the Due Process Clause of the Fifth Amendment. *See United States v. Williams*, 553 U.S. 285, 304 (2008). A law is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or if it is so standardless that it authorizes discriminatory enforcement. *Id.* "But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

Petitioners' reliance on *WRTL* as providing the standard of specificity that the regulations must meet is again misplaced—that standard flows from the strict scrutiny standard of review, which is not the standard of review we must use here. As the Supreme Court emphasized in *WRTL*, the statute there at issue banned certain political speech outright and provided criminal sanctions. *WRTL*, 551 U.S. at 455, 457. Where instead the government is allocating subsidies, the Supreme Court has indicated that the criteria that may be used are less exacting than those required when

speech is directly regulated or a criminal penalty is at stake. Citing *Regan*, the Supreme Court observed in this regard:

> [A]lthough the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake. So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities. See * * * [*Regan*, 461 U.S. at 549] * * * [*Nat'l Endowment for the Arts v. Finley* (*Finley*), 524 U.S. 569, 587–588 (1998).]

As we concluded earlier, the regulatory examples cited above that the Secretary has promulgated to elucidate the meaning of "refers to" extend the phrase's reach beyond communications that actually cite legislation (or a ballot measure) by name and extend the phrase to cover communications that employ terms widely used in connection with the legislation or that reference its general content or effect. Under *Regan*, the imposition of the excise taxes at issue constitutes congressional allocation of a tax subsidy, rather than the direct regulation—indeed, criminal sanctioning—of speech at issue in *WRTL*. Consequently, the criteria for imposing the excise taxes need not meet the standard delineated in *WRTL*.

While undoubtedly the regulatory definition of "refers to" at issue here may give rise to more disputes at the margins[65] than would be the case with a regulation that confined "refers to" to instances where legislation is cited by name, we conclude that any such imprecision does not raise constitutional vagueness problems under the lesser standard for subsidy allocation countenanced in *Finley*. We note in this regard that it is "specific legislation"—also defined in the regulations—that a communication must "refer to" in order to constitute lobbying that could trigger the excise taxes. In this context, the "terms widely used" and "general content or effect" criteria are sufficiently objective that they afford fair notice of the conduct proscribed and are not susceptible of discriminatory enforcement under the less stringent standard

---

[65] We note, for example, that reasonable disputes could arise concerning what constitutes "terms widely used" in connection with given legislation or what constitutes that legislation's general content or effect.

in *Finley*. Consequently, petitioners have not shown that the regulations at issue are unconstitutionally vague.

## IV. *Conclusion*

We conclude, and hold, that Foundation's expenditures for the production and broadcast of the radio messages at issue, except Communication #8 and the first and second radio messages in 2000, were attempts to influence legislation and thus taxable expenditures under section 4945(d)(1). We further conclude that all of Foundation's expenditures at issue except the expenditure for the first 2000 radio message were taxable expenditures under section 4945(d)(5). Accordingly, Foundation is liable for excise taxes under section 4945(a)(1) for its years at issue except with respect to the expenditure for the first 2000 radio message. Because the taxable expenditures we have sustained were not corrected within the taxable period, Foundation is liable for additional taxes under section 4945(b)(1) for its taxable years at issue with respect to those taxable expenditures. Mr. Parks is liable for excise taxes under section 4945(a)(2) for his knowing and willful agreement, as a foundation manager, to the making of the expenditures sustained as taxable expenditures. Mr. Parks is also liable for additional taxes under section 4945(b)(2) for his refusal to agree to correction of the sustained taxable expenditures. Finally, section 4945 and the regulations thereunder are constitutional as applied to petitioners.

To reflect the foregoing,

*Decisions will be entered pursuant to Rule 155.*